**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 6 1997**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

### UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

EARL K. SHUMWAY,

      Defendant Appellant.

Nos. 95-4201 &
96-4000

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. Nos. 94-CR-185 & 95-CR-97)**

---

Wayne T. Dance, Assistant United States Attorney (Scott M. Matheson, United States Attorney, with him on the briefs), Salt Lake City, Utah, for Plaintiff-Appellee.

G. Fred Metos (Joseph C. Fratto, Jr. with him on the briefs), Salt Lake City, Utah, for Defendant-Appellant.

96-4000 submitted on the briefs:[*]

---

Before **SEYMOUR, BRORBY** and **KELLY**, Circuit Judges.

---

    [*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

**BRORBY**, Circuit Judge.

Appellant, Mr. Earl K. Shumway, appeals his conviction and sentence entered in the United States District Court for the District of Utah. We affirm in part, reverse in part, and remand for resentencing.

## I. BACKGROUND

On November 16, 1994, Mr. Shumway was charged in a three-count indictment alleging: 1) violation of the Archaeological Resources Protection Act, 16 U.S.C. § 470ee(a) and 18 U.S.C. § 2; 2) a related charge of damaging United States property under 18 U.S.C. § 1361 and 18 U.S.C. § 2; and 3) felon in possession of a firearm under 18 U.S.C § 922(g). Mr. Shumway pleaded guilty to all three felony counts.

On June 1, 1995, Mr. Shumway was charged in a four-count indictment. Counts one and three alleged violations of the Archaeological Resources Protection Act, 16 U.S.C. § 470ee and 18 U.S.C. § 2. Counts two and four alleged related charges of damaging United States property pursuant to 18 U.S.C. § 1361 and 18 U.S.C. § 2. After a trial, a jury convicted Mr. Shumway of all charges.

In a consolidated sentencing, the district court sentenced Mr. Shumway to seventy-eight months in prison, a three-year term of supervised release, restitution in the amount of $5,510.28, and a $350 special assessment. Mr. Shumway now appeals both his sentence and his jury conviction.

## II. FACTS

Mr. Shumway's jury conviction stemmed from his unauthorized excavation of two Anasazi[2] archeological sites:  Dop-Ki Cave and Horse Rock Ruin. Dop-Ki Cave is located on federal lands in Canyonlands National Park, and Horse Rock Ruin, also known as Cliffdwellers' Pasture or Jack's Pasture, is located on federal lands near Allen Canyon, Manti-LaSal National Forest.

At trial, the government introduced evidence to show Mr. Shumway met a helicopter mechanic, Michael Miller, at a lounge and pool hall in Utah and developed a social relationship with him. The two eventually began discussing Mr. Shumway's experience in finding archeological artifacts and his experience in making large amounts of money selling those artifacts. Mr. Shumway asked Mr.

---

[2]  Anasazi is the name assigned by archaeologists to a prehistoric culture living in the Four Corners area of Utah, Arizona, Colorado, and New Mexico during the Formative Period from 300 A.D. to 1300 A.D.

Miller if he could find a helicopter to fly them around to find archeological artifacts.

Enticed by the prospects of money and Mr. Shumway's apparent knowledge of the subject, Mr. Miller contacted his friend, John Ruhl, a helicopter pilot. Mr. Miller told Mr. Ruhl of the plan to find and sell artifacts and asked Mr. Ruhl to pilot the helicopter to fly Mr. Miller and Mr. Shumway around to look for artifacts. Mr. Ruhl agreed. Mr. Shumway then posed as a movie scout and called Mr. Ruhl's supervisor at the helicopter company claiming he needed the helicopter to look for movie sites. Mr. Shumway arranged to have Mr. Ruhl fly to Moab, Utah, to pick up Mr. Shumway and Mr. Miller.

Once airborne, Mr. Shumway directed Mr. Ruhl to fly to a particular archaeological site southeast of Moab, but Mr. Shumway had trouble locating the site. Unable to find the particular location, the group eventually landed at Dop-Ki Cave in Canyonlands National Park. Mr. Shumway and Mr. Miller began digging in the area. While digging in the cave, Mr. Miller discovered the human remains of an infant wrapped in a burial blanket. Mr. Shumway explained to Mr. Miller he had found a burial site. Mr. Shumway then took over the digging. Mr. Shumway fully excavated the infant remains and removed the burial blanket

leaving the infant remains on the ground. When the damage to the site was later assessed, the only portion of the infant's skeleton remaining was the skull on top of the dirt pile.

The group then attempted, a second time, to find Mr. Shumway's first intended site. Unable to locate it, Mr. Shumway directed Mr. Ruhl to land at Horse Rock Ruin. Mr. Miller testified that based on the directions Mr. Shumway had given, and based on his detailed knowledge of the site, it seemed Mr. Shumway had been to the Horse Rock Ruin site before. The next morning, after spending the night at the site, Mr. Shumway found sandals and a sleeping mat during the dig at the site.

In 1986, Mr. Shumway testified in court regarding his conduct at Horse Rock Ruin in 1984, the same site referred to in counts three and four of the 1995 indictment. The government attempted to admit evidence of Mr. Shumway's prior illegal activities at Horse Rock Ruin to establish identity, knowledge and intent, pursuant to Fed. R. Evid. 404(b). Mr. Shumway filed a motion *in limine* to preclude the government from introducing Rule 404(b) evidence. After the hearing, the district court deemed admissible the evidence relating to Mr. Shumway's 1984 activities in the Horse Rock Ruin.

Specifically, the district court admitted the following evidence: 1) a certified transcript of Mr. Shumway's sworn colloquy with the court in the 1986 case, redacted to include only admissions concerning his 1984 conduct at Horse Rock Ruin; 2) a redacted portion of a videotape of Mr. Shumway examining several artifacts he stated he excavated and removed from Horse Rock Ruin in 1984; 3) the 1986 testimony of United States Forest Service Special Agent Craig Endicott summarizing Mr. Shumway's statements about removing and selling artifacts from the Horse Rock Ruin site in 1984; 4) several photographs of artifacts Mr. Shumway removed from Horse Rock Ruin in 1984; and 5) a certified transcript of Mr. Shumway's sworn testimony in *United States v. Black*, No. CR 67-97 (D. Utah), a case related to the illegal sale of artifacts taken from the Horse Rock Ruin site in 1984. During the motion *in limine* hearing, Mr. Shumway's counsel informed the court his defense at trial would be that Mr. Shumway was not the person who committed the offenses. The district court therefore deemed this evidence admissible, yet limited the evidence's admissibility to the purpose of establishing Mr. Shumway's identity.

During trial, the government requested the district court to reconsider and broaden its previous ruling to allow the 404(b) evidence to prove knowledge and intent in addition to identity. The court determined that absent a stipulation by

Mr. Shumway that identity was the only issue involved, the 404(b) evidence also would be admitted to prove knowledge and intent. Accordingly, the court instructed the jury as to the limited purpose of the 404(b) evidence to establish intent, knowledge and identity.

After the jury convicted Mr. Shumway on all four counts, the district court consolidated for purposes of sentencing the 1994 case that resulted in Mr. Shumway's guilty plea. At sentencing, the court enhanced Mr. Shumway's base offense level as follows: two points for the vulnerable victim adjustment, pursuant to *United States Sentencing Guidelines Manual* § 3A1.1(b) (1995) (hereinafter USSG); two points for obstruction of justice, pursuant to USSG § 3C1.1; and nine points for calculating the loss at $138,000 or more, pursuant to USSG § 2B1.1. Relying on USSG § 4A1.3, the court also departed upward from the Guidelines by increasing Mr. Shumway's criminal history category from III to IV. After the adjustments, Mr. Shumway's total offense level was twenty-two and his criminal history level IV, which resulted in a sentencing range of 63 to 78 months. The district court sentenced Mr. Shumway to seventy-eight months incarceration.

On consolidated appeal we consider five issues: 1) whether the district court erred in admitting evidence of Mr. Shumway's prior acts at Horse Rock Ruin pursuant to Fed. R. Evid. 404(b); 2) whether the district court erred in enhancing Mr. Shumway's offense level by imposing a vulnerable victim adjustment pursuant to USSG § 3A1.1(b); 3) whether the district court erred in enhancing the offense level for obstruction of justice pursuant to USSG § 3C1.1; 4) whether the district court erred in calculating the loss sustained under USSG § 2B1.1; and 5) whether the district court erred in departing upward from the Guidelines by increasing Mr. Shumway's criminal history category from III to IV under USSG § 4A1.3.

## III. 404(b) Evidence

Mr. Shumway argues the district court erred in admitting the evidence regarding his 1984 acts in Horse Rock Ruin for purposes of identity, knowledge and intent. Specifically, Mr. Shumway argues the 1984 evidence lacked the "signature quality" necessary to show identity and was highly prejudicial to Mr. Shumway.

We review the district court's admission of evidence under Fed. R. Evid. 404(b) for an abuse of discretion. *United States v. Wilson*, 107 F.3d 774, 782

(10th Cir. 1997). "An abuse of discretion occurs when a judicial determination is arbitrary, capricious or whimsical." *United States v. Wright*, 826 F.2d 938, 943 (10th Cir. 1987). We will not overturn a discretionary judgment by the trial court where it falls within the "'bounds of permissible choice in the circumstances.'" *United States v. Dorrough*, 84 F.3d 1309, 1311 (10th Cir.) (quoting *Moothart v. Bell*, 21 F.3d 1499, 1504 (10th Cir. 1994)), *cert. denied*, 117 S. Ct. 446 (1996).

> Under Fed. R. Evid. 404(b):
>
> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident ....

In determining whether the admission of 404(b) evidence was proper, we apply a four-part test, which requires the following: 1) the evidence was offered for a proper purpose; 2) the evidence was relevant; 3) the trial court properly determined under Fed. R. Evid. 403 the probative value of the similar-acts evidence was not substantially outweighed by its potential for unfair prejudice; and 4) the trial court gave the jury proper limiting instructions upon request. *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988); *United States v. Hill*,

60 F.3d 672, 676 (10th Cir.), *cert. denied*, 116 S. Ct. 432 (1995).[3]  Because all four parts of the *Huddleston* test are satisfied, we conclude the district court did not abuse its discretion in admitting evidence of Mr. Shumway's prior illegal acts at Horse Rock Ruin.

### A. Proper Purpose and Relevance

First, the government offered, and the district court admitted, the evidence of Mr. Shumway's prior activities at Horse Rock Ruin for proper purposes under Fed. R. Evid. 404(b): identity, knowledge, and intent.  Second, the evidence was relevant as to each of these factors.

### 1. Relevance--Identity

As stated, at a pretrial hearing on Mr. Shumway's motion *in limine* to exclude the evidence, Mr. Shumway's counsel stated his main defense would be that Mr. Shumway was not the person involved.  After the hearing, the district court determined it would allow the prior evidence only to show identity.  The court held, and we agree, the evidence of Mr. Shumway's 1984 prior activities at

---

[3] To the extent Mr. Shumway argues this court's decision in *United States v. Harrison*, 942 F.2d 751, 759-60 (10th Cir. 1991) is inconsistent with *Huddleston*'s four-part test, we disagree and reject the argument.

Horse Rock Ruin, the exact same site as that specified in two counts of the 1995 indictment, made more likely the inference the same person looted the same site on both occasions.

Mr. Shumway argues, however, the prior act evidence was not relevant under 404(b) because the prior act lacked the "signature quality" necessary to show identity. Specifically, Mr. Shumway argues the 1984 act was not sufficiently similar to the acts at issue in the present case to be probative of identity because the methods used to excavate the sites were not sufficiently similar. Additionally, Mr. Shumway argues the prior act is not probative of identity because it preceded the acts at issue in the trial by seven years. We disagree.

We have held that to prove identity, evidence of prior illegal acts need not be identical to the crime charged, so long as, based on a "totality of the comparison," the acts share enough elements to constitute a "signature quality." *United States v. Patterson*, 20 F.3d 809, 813 (10th Cir.), *cert. denied*, 513 U.S. 841 (1994); *United States v. Ingraham*, 832 F.2d 229, 233 (1st Cir. 1987); *United States v. Gutierrez*, 696 F.2d 753, 754 (10th Cir. 1982), *cert. denied*, 461 U.S. 909 and 461 U.S. 910 (1983).

Elements relevant to a "signature quality" determination include the following: geographic location, *United States v. Porter*, 881 F.2d 878, 887 (10th Cir. 1989) (fact that all crimes took place in small rural Kansas communities relevant to "signature quality" determination); *United States v. Stubbins*, 887 F.2d 42, 44 (11th Cir. 1989) (that both offenses occurred at the same premises was probative of identity); the unusual quality of the crime, *Patterson*, 20 F.3d at 813 (fact that hijacking is an unusual crime was a relevant factor in "signature quality" determination); the skill necessary to commit the acts, *United States v. Barrett*, 539 F.2d 244, 248 (1st Cir. 1976) (ability to bypass burglar alarm a "distinctive feature" of crime); *United States v. Garcia*, 880 F.2d 1277, 1278 (11th Cir. 1989) (defendant's skill in forging documents relevant to show identity); or use of a distinctive device, *United States v. Trenkler*, 61 F.3d 45, 55 (1st Cir. 1995) (defendant's prior use of distinctive remote-control car bombs relevant in determining whether same person built both bombs); *United States v. Andrini*, 685 F.2d 1094, 1097 (9th Cir. 1982) (defendant's description of distinctive incendiary devise used in crime "sufficiently distinctive to show identity.").

These enumerated elements relevant to a "signature quality" determination are not inclusive. Furthermore, the weight to be given to any one element and the

number of elements necessary to constitute a "signature" are highly dependent on the elements' uniqueness in the context of a particular case.  In other words, a few highly unique factors may constitute a "signature," while a number of lesser unique factors "although insufficient to generate a strong inference of identity if considered separately, may be of significant probative value when considered together."  *United States v. Myers*, 550 F.2d 1036, 1045 (5th Cir. 1977).

It is by this reasoning we are guided in making our "signature quality" determination.  Here, the evidence of Mr. Shumway's prior activities at Horse Rock Ruin and the activities charged at trial share at least two distinctive features such that they demonstrate a "signature quality":  the unique geographical location, and the skill and specialized knowledge necessary to commit both acts.  *See United States v. Stubbins*, 877 F.2d 42 (11th Cir.), *cert. denied*, 493 U.S. 940 (1989); *United States v. Barrett*, 539 F.2d 244, 248 (1st Cir. 1976).

First, Mr. Shumway visited Horse Rock Ruin to loot its contents once before.  In *Stubbins*, the defendant was tried for conspiracy and distribution of crack cocaine.  His main defense at trial was mistaken identity.  877 F.2d at 43. The prosecution attempted to admit evidence of a prior similar drug sale that took place at the same address as the location of the offense at issue during trial.  *Id.*

The court held the prior acts evidence was admissible and relevant to show identity under Fed. R. Evid. 404(b). *Id.* at 44. Specifically, the court held one distinctive feature of both offenses was that they occurred at the same address, a factor "sufficiently unusual and distinctive" as to be probative of identity. *Id.* at 44. The same is true here. An expert testified during Mr. Shumway's trial there are approximately 22,000 documented archaeological sites located within San Juan County, Utah, alone; however, Mr. Shumway chose the exact same site once before to search for artifacts. Consequently, while the methods employed at the Horse Rock Ruin site may not have been identical, given the context of this case, both acts share as a distinctive element the exact same location.

Also, Mr. Shumway's prior activities and the acts charged share a second distinctive feature: the skill and specialized knowledge necessary to commit both acts. *Barrett*, 539 F.2d at 248. In *Barrett*, the defendant was charged with crimes arising from the theft of a collection of postage stamps from a museum. *Id.* at 245. During the investigation it was discovered the burglars had bypassed the alarm system using sophisticated methods requiring skill and specialized knowledge. *Id.* at 246, 248. The circuit court affirmed the district court's decision to allow testimony portraying the defendant as one knowledgeable in the workings of burglar alarms. *Id.* at 247-49. In so holding, the court explained

because the knowledge and expertise necessary to commit the crime was "so distinctive a feature" of the crime, evidence of the defendant's knowledge was relevant to establish identity. *Id.* at 248.

We find *Barrett*'s reasoning persuasive here. The existence of 22,000 sites in San Juan County alone, the remoteness of the location, the difficulty of access, and the varying concentration of artifacts, all suggest the person who committed both the prior act and the charged acts was one possessing distinctive, unique and unusual skills necessary to locate and excavate the artifacts. Extensive testimony was introduced showing that Mr. Shumway's statements and actions demonstrated substantial specialized knowledge and prior visits to the site. Mr. Miller testified Mr. Shumway had detailed knowledge as to how to get to the site and had a high degree of familiarity with the Horse Rock Ruin site. Particularly, Mr. Miller testified Mr. Shumway knew precisely where at the Horse Rock Ruin site to find artifacts. The prior acts evidence Mr. Shumway had looted the Horse Rock Ruin site once before therefore is probative to show he was one with specialized skill and knowledge sufficient to commit the acts charged. The fact Mr. Shumway not only looted before, but looted the Horse Rock Ruin once before, shows he had knowledge of the site's location and means of access, as well as the artifacts to be found there.

Therefore, we hold the two features shared by the prior and charged acts -- location and skill -- are sufficient under the circumstances of this case to constitute a "signature quality" such that commission of the prior act was relevant to show identity.

Mr. Shumway also argues because the first occurrence at Horse Rock Ruin was seven years prior to the second, it was not probative of identity. However, "'[t]here is no absolute rule regarding the number of years that can separate offenses. Rather, the court applies a reasonableness standard and examines the facts and circumstances of each case.'" *United States v. Franklin*, 704 F.2d 1183, 1189 (10th Cir.) (quoting *United States v. Engleman*, 648 F.2d 473, 479 (8th Cir. 1981)), *cert. denied*, 464 U.S. 845 (1983). Here, the district court considered the seven-year time span when deciding whether the evidence was probative; Mr. Shumway fails to convince us the district court abused its discretion in reaching its conclusion the evidence was probative as to identity.

## 2. Relevance--Intent and Knowledge

As stated, the district court initially allowed the prior acts evidence only to show identity. However, during trial, the court reconsidered its decision and admitted the evidence also to show knowledge and intent. The district court held

since knowledge and intent were required elements, and since Mr. Shumway had not stipulated that the only contested issue was identity, the 404(b) evidence was admissible to show knowledge and intent as well as identity. We agree.

The 404(b) evidence was relevant to show intent. Mr. Shumway was charged with violating 18 U.S.C. § 1361, which requires the government prove the accused acted "willfully." Therefore, Mr. Shumway's intent was an essential element of the crime charged. By standing on his not guilty plea, and by failing to give enforceable pretrial assurances he did not intend to dispute criminal intent, the government may "'include such extrinsic offense evidence as would be admissible if intent were actively contested.'" *Franklin*, 704 F.2d at 1188 (quoting *United States v. Webb*, 625 F.2d 709, 710 (5th Cir. 1980)). *See also Hill*, 60 F.3d at 676. Prior acts evidence is "clearly" relevant to show an essential element of the charged offense. *Hill*, 60 F.3d at 676. Therefore, the 404(b) evidence was relevant to show the essential intent elements of 18 U.S.C. § 1361.

The 404(b) evidence was also relevant to show "knowledge" as to the charged violation of 16 U.S.C. § 470ee(a). Under § 470ee(a), no person may excavate, remove, etc. any archaeological resource located on public lands. 16 U.S.C. 470ee(a) (1994). Here, the 404(b) evidence tended to show Mr. Shumway

knew the objects he was excavating were archaeological resources. *See Hill*, 60 F.3d at 676 (evidence of prior cocaine possessions admissible to show the defendant knew the substance he possessed was cocaine). Consequently, we hold the prior acts evidence was relevant to show identity, knowledge and intent as well as identity.

### B. Probative Value Versus Prejudice

Mr. Shumway argues admission of the 404(b) evidence was highly prejudicial under Fed. R. Evid. 403 and therefore the district court erred in admitting the 404(b) evidence under *Huddleston*'s second prong. However, the district court explicitly found the probative value of the 404(b) evidence was not substantially outweighed by its potential for prejudice. The trial court is vested with broad discretion in determining whether evidence's probative value is substantially outweighed by its potential to cause prejudice. *Patterson*, 20 F.3d at 814. "Evidence of prior bad acts will always be prejudicial, and it is the trial court's job to evaluate whether the guaranteed risk of prejudice outweighs the legitimate contribution of the evidence." *Id.* Mr. Shumway makes no more than conclusory statements the district court admission of the 404(b) evidence was prejudicial to his defense. However, "we are required to give the trial court 'substantial deference' in Rule 403 rulings." *Id.* In light of the district court's

explicit findings the 404(b) evidence's probative value was not substantially outweighed by its potential for prejudice, and because Mr. Shumway fails to convince us otherwise, we find no abuse of discretion. Therefore, we affirm the district court's determination the probative value of the 404(b) evidence was not substantially outweighed by its potential for prejudice.

**C. Limiting Instruction**

*Huddleston*'s fourth prong requires the district court, upon request, to instruct the jury that the 404(b) evidence is to be considered only for the proper purpose for which it was admitted. 485 U.S. at 691-92. Here, the district court properly gave such a limiting instruction to the jury that the 404(b) evidence was to be considered only for the purposes of intent, knowledge and identity. Having therefore determined the admission of the 404(b) evidence satisfied every element of *Huddleston*, 485 U.S. at 691-92, we hold the district court did not abuse its discretion in admitting the prior acts evidence under Fed. R. Evid. 404(b).

**IV. SENTENCING--Base Level Enhancements**

**A. Vulnerable Victim**

At sentencing, the district court enhanced Mr. Shumway's base offense level by two points under USSG § 3A1.1(b), which provides:

If the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct, increase by **2** levels.

We must now decide whether the human skeleton of an Anasazi infant is a "vulnerable victim" for purposes of § 3A1.1(b) of the Sentencing Guidelines.

Normally, a district court's determination of a "vulnerable victim" for purposes of USSG § 3A1.1(b) is a question of fact reviewable for clear error. *United States v. Hardesty*, 105 F.3d 558, 559 (10th Cir. 1997). Here, however, the question is not so clear-cut; rather, the question is whether USSG § 3A1.1(b) properly is interpreted to include skeletal remains as "vulnerable victims." This question deals with the district court's interpretation of the Guidelines, which we review *de novo. United States v. Frazier*, 53 F.3d 1105, 1111 (10th Cir. 1995). We hold USSG § 3A1.1(b) does not apply to prehistoric human skeletal remains.[4]

---

[4] This is not to say, however, that we do not recognize the special import of this case's context. We are aware of the increasing need for the protection of Native American burial sites, and we in no way intend to diminish the cultural importance of those sites nor the importance of a commitment to the preservation of those sites. Nevertheless, we are left with somewhat of a conundrum. Grave robbing, especially grave robbing the sacred objects of Native Americans, is undoubtedly detestable conduct worthy of severe castigation; however, such castigation cannot come at the expense of reason and common sense. Certainly, better means exist to deter the loathsome conduct of grave robbers than to drain the term "vulnerable victim" of any reasonable meaning.

We are convinced that to interpret "vulnerable victim" to include skeletal remains would stretch the imagination, and would render application of USSG § 3A1.1(b) potentially absurd.

The status of "vulnerable victim" hinges on the idea that some characteristic renders a victim "particularly susceptible" to the criminal conduct. In other words, the "vulnerable victim" is someone who is unable to protect himself or herself from criminal conduct, and is therefore in need of greater societal protection than the average citizen. *United States v. Brunson*, 54 F.3d 673, 676 (10th Cir.), *cert. denied*, 116 S. Ct. 397 (1995). Skeletons certainly are completely unable to defend against criminal conduct. However, to illustrate the absurdity of applying the "vulnerable victim" status to a skeleton, consider for example, a pile of cremated remains, or a pile of dirt that was once a pile of bones; if skeletal remains are "vulnerable victims," certainly, then, these types of remains also should qualify. These types of human remains are undoubtably no more able to guard against criminal harm than a buried infant skeleton, yet can they qualify as a victim? Our answer is an unqualified no. These examples illustrate the untenable results application of the Guidelines to skeletal remains would have, and this we refuse to justify.

In support of the proposition the infant skeleton qualifies as a "vulnerable victim" under USSG § 3A1.1(b), the government relies on *United States v. Roberson*, 872 F.2d 597 (5th Cir.), *cert. denied*, 493 U.S. 861 (1989), and *United States v. Quintero*, 21 F.3d 885 (9th Cir. 1994). In *Roberson*, the defendant's eighty-four-year-old roommate died after falling and hitting his head on a table. 872 F.2d at 599. The defendant feared the police would think he killed the man, so he put the body in his car and drove around Texas for several days. *Id.* During this time, the defendant charged several thousands of dollars on the dead man's credit card. *Id.* After a few days, the defendant put the body in a garbage dumpster, doused it with diesel fuel, and burned it beyond recognition. *Id.* The defendant was convicted of credit card fraud. *Id.* at 600. The district court enhanced the defendant's offense level pursuant to USSG § 3A1.1's "vulnerable victim" provision, *id.*, and departed upward from the guideline range finding his conduct constituted "extreme conduct" pursuant to USSG § 5K2.8.[5] *Id.* at 602.

---

[5] USSG § 5K2.8 (1995), which has remained unchanged since its original effective date, provides:

> If the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct. Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation.

On appeal, the Fifth Circuit held the district court did not err in applying either provision to the defendant's sentencing calculation. *Id.* at 608, 612. However, the circuit court did not specifically address the defendant's argument that the body could not be a "victim." *Id.* at 604. Rather, the circuit court focused on rejecting the defendant's argument the owner of the credit card could not be a "victim" for purposes of the Guidelines if he was not a "victim" of the crime of conviction. *Id.* at 605, 608-09. The court held the Guidelines required no such nexus -- USSG § 5K2.8 and § 3A1.1 did not require the "victim" for purposes of the sentencing departure to be the "victim" for purposes of the crime. *Id.* at 609. The court glossed the issue of whether a victim must be alive or dead. Consequently, *Roberson* is not particularly helpful to our "vulnerable victim" analysis.

We have a similar problem applying *Quintero*. In *Quintero*, after the defendant's two-year-old daughter died, to avoid discovery, the defendant burned the body, removed the head with a shovel, and left it at a different location several miles away. 21 F.3d at 889. At sentencing, the district court departed upward from the sentencing range finding the defendant's conduct after the girl's death constituted "extreme conduct" for purposes of USSG § 5K2.8. *Id.* at 893. On appeal, the defendant argued USSG § 5K2.8 applied only to live victims. *Id.*

at 894. The Ninth Circuit affirmed the "extreme conduct" departure holding "[t]he section focuses on the defendant's conduct, not the characteristics of the victim." *Id.* The court went on to explain the term "victim" as used in USSG § 5K2.8 was meant simply to modify "degrading," and was not meant to distract from the provision's focus on the offender's conduct:

> The phrase "to the victim" appears to modify the term "degrading," making the point that the Sentencing Commission was not concerned about conduct that might be degrading to the offender. By contrast, the terms "heinous," "cruel," or "brutal" conduct need no such clarification.

*Id.* at 894 n.8. The *Quintero* analysis does not apply here. It is true the Guideline's "vulnerable victim" provision does, as do all the provisions, deal generally with the offender's conduct; the evident purpose of the guideline is "to punish more severely conduct that is morally more culpable and to protect such victims by adding more deterrence." *United States v. Gill*, 99 F.3d 484, 488 (1st Cir. 1996). However, unlike the "extreme conduct" provision, which focuses on the nature of the offender's conduct, the "vulnerable victim" enhancement focuses heavily on the characteristics of the crime's victim. This, we find, is a compelling distinction, for in provisions such as the USSG § 5K2.8 "extreme conduct" provision, the state of the victim, living or dead, is of far less consequence. As a result, our holding here is not intended to limit the application of provisions such as § 5K2.8, which focus on the offender's conduct. We leave for another day the

question whether the "extreme conduct" provision, or like provisions, could properly apply to this case, or any case where the supposed "victim" is no longer among the living.

For all these reasons, we hold the skeletal remains in this case could not constitute a "vulnerable victim" for purposes of sentencing enhancement under § 3A1.1(b). Consequently, we remand this case for resentencing without the "vulnerable victim" two-part enhancement.[6]

## B. Calculation of Loss

Mr. Shumway argues the district court erred in its method of calculating loss. On appeal, while we review the district court's factual findings for clear error, we review *de novo* questions of what factors the district court may consider in assessing loss under the Guidelines. *United States v. Williams*, 50 F.3d 863, 864 (10th Cir. 1995).

---

[6] Mr. Shumway also makes the following two arguments the "vulnerable victim" enhancement was in error: the "vulnerable victim" enhancement was improper because there was no evidence Mr. Shumway "targeted" the victim, and the enhancement was improper because the skeletal remains did not constitute an "unusually vulnerable victim." *See, e.g., Hardesty*, 105 F.3d at 560; *Brunson*, 54 F.3d at 677. Because we reverse the district court's application of the enhancement to Mr. Shumway's sentence on other grounds, we need not address these arguments.

The district court applied USSG § 2B1.3 when it calculated Mr. Shumway's offense level. Section 2B1.3(b)(1) directs the court to § 2B1.1 to calculate loss. The district court calculated loss at "[m]ore than $120,000," which, pursuant to USSG §2B1.1(b)(1)(J), increased Mr. Shumway's offense level by nine points.

Application note 2 of § 2B1.1 explains that when property is taken or destroyed, "loss is the fair market value" of the property taken, and when property is damaged, "loss is the cost of repairs, not to exceed the loss had the property been destroyed." Application note 2 also provides: "Where the market value is difficult to ascertain or inadequate to measure harm to the victim, the court may measure loss in some other way." USSG § 2B1.1 comment. (n.2). Specifically relying on this second provision, the district court turned to the regulations promulgated pursuant to the Archaeological Resources Protection Act to calculate loss. 16 U.S.C. § 470ii ; 43 C.F.R. § 7.14. Section 470ee of the Archaeological Resources Protection Act, the statute under which Mr. Shumway was convicted and which he admitted violating, identifies archaeological value and cost of repair as relevant factors in determining the violation's severity. 16 U.S.C. § 470ee(d). 43 C.F.R. § 7.14 defines both "archaeological value" and "cost of repair."[7]

---

[7] Specifically, 43 C.F.R. § 7.14 provides:

**§ 7.14 Determination of archaeological or commercial value and**

During Mr. Shumway's trial, two archaeologists testified as to both "archaelogical value" and "cost of restoration and repair," as determined under 43 C.F.R. § 7.14, and estimated the total damage to both the Dop-Ki Cave and Horse Rock Ruin at about $96,500. Also, an archaeological damage assessment report was prepared for the two additional sites damaged in the counts to which Mr. Shumway pleaded guilty. The damage report estimated damage to those additional sites at about $40,700. Because the sentencing was consolidated to sentence Mr. Shumway both for the results of his conviction and for the results of his guilty plea, the

---

**cost of restoration and repair**

(a) *Archaeological value*. ... [T]he archaeological value of any archaeological resource involved in a violation of the prohibitions in § 7.4 ... shall be the value of the information associated with the archaeological resource. This value shall be appraised in terms of the costs of the retrieval of the scientific information which would have been obtainable prior to the violation. These costs may include, but need not be limited to, the cost of preparing a research design, conducting field work, carrying out laboratory analysis, and preparing report as would be necessary to realize the information potential.

...

(c) *Cost of restoration and repair*. ... [T]he cost of restoration and repair of archaeological resources damaged as a result of a violation of prohibitions or conditions ... shall be the sum of the costs already incurred for emergency and restoration or repair work, plus those costs projected to be necessary to complete restoration and repair ....

district court added these two estimates of loss as calculated pursuant to 43 C.F.R. § 7.14 to enhance Mr. Shumway's sentence.

Mr. Shumway argues the court should have relied solely on the cost of repairs to the sites and the fair market value of the artifacts taken to calculate a loss of $9,122. Mr. Shumway argues the court's method of calculation was not one contemplated by the Guidelines and resulted in an incorrect standard of measure. We disagree.

For purposes of determining an appropriate offense level under the Guidelines, "loss" is not simply intended to be a measure of net monetary damage. "Loss" also serves to "gauge the severity of a particular offense." *United States v. Lara*, 956 F.2d 994, 999 (10th Cir. 1992). Here, the district court quoted part of USSG § 2B1.1's application note 2, and specifically relied on the language stating where the market value of the property at issue is "inadequate to measure harm to the victim," the court may determine loss some other way. By expressly relying on this language, the district court implicitly found the fair market value of the artifacts inadequately reflected the level of harm Mr. Shumway inflicted. As a result, the district court turned to the objective measure of damage as reflected in

regulations specific to the statute Mr. Shumway was convicted of violating -- 43 C.F.R. § 7.14.

Congress enacted the Archaeological Resources Protection Act to ensure for the present and future benefit of the American people, irreplaceable aspects of Native American history and culture. 16 U.S.C. § 470aa(a), (b). We agree with the district court the paltry sum of $9,122, the asserted cost of the artifact's fair market value and cost of restoration and repair, fails to reflect adequately the extent of damage Mr. Shumway inflicted. The fair market value and cost of repair calculation was grossly insufficient to quantify the devastating and irremediable cultural, scientific and spiritual damage Mr. Shumway caused to the American people in general and to the Native American community in particular. The Guidelines provided the district court could calculate loss in some way other than fair market value and cost of repair, if those calculations were inadequate. USSG § 2B1.1 comment. (n.2). The district court relied on this flexible provision and used a reasonable and objective measure specifically formulated to calculate damages under the statute Mr. Shumway was convicted of violating to calculate loss for purposes of sentencing. 43 C.F.R. § 7.14. We hold the district court's method of calculating loss for the purposes of sentencing was proper.

### C. Obstruction of Justice

Mr. Shumway argues the district court erred in enhancing his offense level for obstruction of justice pursuant to USSG § 3C1.1.  On appeal, we review the district court's factual findings on this issue for clear error and its legal conclusions *de novo*.  *United States v. Pretty*, 98 F.3d 1213, 1221 (10th Cir. 1996), *petition for cert. filed* (U.S. Feb. 5, 1997) (No. 96-7768).

Under the Guidelines, the district court must enhance the defendant's offense level by two "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense."  USSG § 3C1.1.  Perjury can be the basis for such an enhancement.  *Id.,* comment. (n.3(b)).  Under § 3C1.1, a defendant commits perjury if he or she "gives false testimony concerning a material matter with the willful intent to provide false testimony."  *United States v. Dunnigan*, 507 U.S. 87, 94 (1993); *Pretty*, 98 F.3d at 1221.

The district court enhanced Mr. Shumway's offense level by two for obstruction of justice after finding Mr. Shumway committed perjury during the hearing in which he pleaded guilty to the 1994 three-count indictment.  Specifically, the district court found Mr. Shumway perjured himself by testifying

that his codefendant in the 1994 case, Mr. Verchick, did not assist him in any digging, and did not go into the alcoves at issue with him. Mr. Verchick later pleaded guilty to the charges against him and testified he entered the alcoves with Mr. Shumway. The district court found, therefore, Mr. Shumway had committed perjury and the two-level enhancement pursuant to § 3C1.1 was warranted.

Mr. Shumway argues the obstruction of justice enhancement was in error because the false statements were not "material" as defined by the Guidelines.[8] Specifically, Mr. Shumway argues because his testimony did not specifically exculpate his codefendant, Mr. Shumway's false statements were not "material" for purposes of § 3C1.1. Because we find no evidence the district court's findings are in clear error, and because we find the district court's application of the Guideline proper, we affirm the enhancement.

In *United States v. Bernaugh*, 969 F.2d 858, 862 (10th Cir. 1992), we affirmed the district court's obstruction of justice enhancement where, during his guilty-plea hearing, the defendant made false statements regarding his

---

[8] For purposes of § 3C1.1, "material" is defined as: "evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination." USSG § 3C1.1, comment. (n.5).

codefendant's illegal activities. We held the district court's obstruction of justice enhancement was proper because "the section 3C1.1 enhancement applies where a defendant attempts to obstruct justice in a case closely related to his own, such as that of a codefendant." *Bernaugh*, 969 F.2d at 861. The same is true here. Mr. Shumway made false statements regarding his codefendant's role in an apparent attempt to relieve his codefendant of criminal liability. Mr. Shumway argues that while his testimony regarding his codefendant was "less than forthcoming," the testimony was not "materially" perjurious because Mr. Shumway did not provide a story that fully exculpated his codefendant. However, to sustain a USSG § 3C1.1 enhancement, a defendant need not provide a story that when believed, would fully exculpate his or her codefendant. Rather, it is enough that a defendant provides false information bearing on the extent of the codefendant's criminal liability. *Bernaugh*, 969 F.2d at 862. Therefore, because Mr. Shumway made false statements bearing on the criminal liability of his codefendant, we hold the district court properly enhanced his offense level pursuant to USSG § 3C1.1.

## V. SENTENCING--Upward Departure

The presentence report assigned Mr. Shumway a criminal history category of III. Mr. Shumway's criminal history, combined with the enhanced offense level of 22, resulted in an applicable sentencing range under the Guidelines of 51

to 63 months. During sentencing, the district court relied on USSG § 4A1.3, p.s., which suggests a district court adjust the criminal history category if "reliable information" convinces the court the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct, or likelihood the defendant will commit future crimes. USSG § 4A1.3, p.s. The district court looked to several factors and determined Mr. Shumway's criminal history category of III did not adequately reflect the seriousness of his past conduct, nor the likelihood he would commit future crimes. After determining the criminal history category of III was inadequate, the district court treated Mr. Shumway as if he had one additional felony conviction, which resulted in an adjusted criminal history category of IV. The court then referenced the sentencing range for a defendant with an offense level of 22 and a criminal history category of IV -- 63-78 months -- and sentenced Mr. Shumway to seventy-eight months.

Mr. Shumway argues the district court's upward departure was in error for three reasons: 1) the district court did not adequately articulate its reasons for departure; 2) the district court was unclear as to whether it considered factors already taken into account by the Guidelines; and 3) the departure was not reasonable.

On appeal, we review the district court's decision to depart from the Sentencing Guidelines for an abuse of discretion. *United States v. Koon*, 116 S. Ct. 2035, 2043 (1996); *United States v. Contreras*, 108 F.3d 1255, 1270 (10th Cir. 1997). A district court may depart from the applicable sentencing range if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration" by the Guidelines. 18 U.S.C. § 3553(b) (1994); *Koon*, 116 S. Ct at 2044. "Before a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline." *Koon*, 116 S. Ct at 2046. The district court has an "institutional advantage" over appellate courts in making these sorts of determinations due to extensive experience in applying the Guidelines. Nevertheless, "[a] district court by definition abuses its discretion when it makes an error of law," such that "[t]he abuse of discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions." *Koon*, 116 S. Ct. at 2047-48. Once we determine whether the district court has abused its discretion in departing from the Guidelines, we review the departure for reasonableness. 18 U.S.C. § 3742(e)(3); *United States v. White*, 893 F.2d 276, 278 (10th Cir. 1990); *cf. Williams v. United States*, 503 U.S. 193, 204 (1992) (even if district court departs from the Guidelines based on an erroneous factor, appellate court may affirm the sentence if it is satisfied the

district court would have made the same sentence without the erroneous factor, and the degree of departure is reasonable).

We now turn to the question whether the district court abused its discretion in departing from the Guidelines. The presentence report documented Mr. Shumway's extensive past illegal conduct of looting archaeological sites. Part of this evidence included Mr. Shumway's own statements at a trial related to his 1984 illegal acts at Horse Rock Ruin. Specifically, Mr. Shumway stated under oath he had been digging artifacts from public lands since a young age and had looted archaeological sites "thousands of times." Additionally, Mr. Shumway appeared in a videotaped documentary that focused on the looting of archaeological sites in San Juan County, Utah. In the documentary, Mr. Shumway discussed how low the chances were of an experienced looter being caught. The presentence report also summarized an article in which Mr. Shumway was quoted as saying: "If the government can come down here and say we don't have the right to dig in a place where we've lived all our lives, I'd just as soon go to prison. I'm not gonna bring my kid into a world where you can't go out and dig up an old ruin."

The district court considered this information set out in the presentence report and found Mr. Shumway had looted "at least 100 other times" than those which resulted in convictions, and had "made a way of life out of pot hunting down there on government lands and apparently thought or may still think that he has the right to do this". Additionally, the district court found "there's a strong likelihood he will commit other crimes." Based on these findings, the district court treated Mr. Shumway as if he had one additional felony, and added three criminal history points, which resulted in a criminal history category of IV.

We conclude the district court did not abuse its discretion in departing from the Guidelines. The court relied on USSG § 4A1.3, p.s., which allows a court to use "reliable information" in determining whether to adjust the criminal history category. Specifically, USSG § 4A1.3(e) lists "prior similar adult conduct not resulting in a criminal conviction" as reliable information. In determining Mr. Shumway's past criminal conduct was sufficiently unusual to warrant an upward departure from the guideline range, the district court relied on Mr. Shumway's own admissions of his repeated illegal looting of archaeological sites, and relied on the probability Mr. Shumway would commit similar crimes in the future based on his "pot hunting" way of life, and his apparent belief he had every right to engage in such conduct. The district court relied on factors specifically listed in

USSG § 4A1.3, and we remain unconvinced the district court abused its discretion in departing from the guideline range based on these factors.

Mr. Shumway's arguments the district court failed to articulate its reasons for departure, and that the district court may have applied factors already taken into account by the Guidelines do not convince us otherwise. The district court articulated the information it relied on in making its decision to depart; it is clear the district court did not rely on factors already taken into account by the Guidelines. Rather, the district court relied on USSG § 4A1.3(e), p.s., which is an "encouraged factor" for departure. An "encouraged factor" is one "'the Commission has not been able to take into account fully in formulating the guidelines.'" *Koon*, 116 S. Ct. at 2045 (quoting USSG § 5K2.0). Indeed, USSG § 4A1.3 comment. (backg'd.) states: "This policy statement recognizes that the criminal history score is unlikely to take into account all the variations in the seriousness of criminal history that may occur." Consequently, the district court did not erroneously rely on factors the Guidelines had already taken into account. The district court relied on information that was sufficiently unusual to take Mr. Shumway's case outside the Guidelines' heartland.

Mr. Shumway also argues the district court's departure was not reasonable. We disagree. In assessing whether the degree of departure was reasonable, we consider the district court's reasons for imposing the particular sentence together with factors such as: "the seriousness of the offense, the need for just punishment, deterrence, protection of the public, correctional treatment, the sentencing pattern of the Guidelines, the policy statements contained in the Guidelines, and the need to avoid unwarranted sentencing disparities." *White*, 893 F.2d at 278; 18 U.S.C. § 3742(e)(3); 18 U.S.C. § 3553(a); *see also Williams*, 503 U.S. at 203-04.

The district court added three points to Mr. Shumway's criminal history level after analogizing Mr. Shumway's history to a defendant with one additional felony conviction. Such analogies are specifically provided for in USSG § 4A1.3, p.s.:

> In considering a departure under this provision, the Commission intends that the court use, as a reference, the guideline range for a defendant with a higher or lower criminal history category, as applicable. For example, if the court concludes that the defendant's criminal history category of III significantly under-represents the seriousness of the defendant's criminal history, and that the seriousness of the defendant's criminal history most closely resembles that of most defendants with Criminal History Category IV, the court should look to the guideline range specified for a defendant with Criminal History Category IV to guide its departure.

The district court closely followed this provision by adding the same number of criminal history points as if Mr. Shumway had one additional prior felony conviction.

The district court may use any "'reasonable methodology hitched to the Sentencing Guidelines to justify the reasonableness of the departure,'" which includes using extrapolation from or analogy to the Guidelines. *United States v. Jackson*, 921 F.2d 985, 991 (10th Cir. 1990) (quoting *United States v. Harris*, 907 F.2d 121, 124 (10th Cir. 1990)). Here, the district court was explicit in its method of departure. Additionally, the departure is consistent with the factors to be considered in imposing a sentence under 18 U.S.C. § 3553(a). We hold the district court's degree of departure from the Guidelines was reasonable.

Accordingly, the district court is **AFFIRMED** in part and **REVERSED** in part, and we **REMAND** to the district court for resentencing in accordance with this opinion.