**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 29 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

　　Plaintiff-Appellee,

v.

ALFREDO RAY CESSPOOCH,

　　Defendant-Appellant.

No. 97-4013
(D.C. No. 93-CR-281)
(D. Utah)

---

**ORDER AND JUDGMENT**[*]

---

Before **PORFILIO, HOLLOWAY,** and **HENRY**, Circuit Judges.

---

Alfred Cesspooch brings this timely direct appeal from his convictions on each of three charges against him: assault resulting in serious bodily injury in violation of 18 U.S.C. § 113(f) (now § 113(a)(6)), Count 1; assault with a dangerous weapon in violation of 18 U.S.C. § 113(c) (now § 113(a)(3)), Count 2; and aggravated sexual abuse in violation of 18 U.S.C. § 2241(a), Count 3. Defendant Cesspooch is an enrolled member of the Ute Indian Tribe and, according to testimony heard at the trial, the offenses occurred in Indian country,

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

as defined by 18 U.S.C. § 1151.[1]

# I

Sherron Clark and Alfred Cesspooch were married in July 1993. They had met about a year earlier and had begun dating soon thereafter. Mr. Cesspooch had begun courting by giving Ms. Clark flowers and gifts. II R. 138. She testified that in November 1992, however, he assaulted her for a period of about an hour, choking her and punching her in the chest. II R. at 138-140. After that incident Ms. Clark didn't see Mr. Cesspooch for several months because he was incarcerated in Oregon. However, in March 1993, the couple began living together. A tribal court judge performed a marriage for them in July 1993Id. at 148. In early August 1993, after the marriage, Cesspooch became violent one night, hitting her and pulling her hair. Id. at 149. Defendant was jailed briefly after that incident and was released on September 9, 1993.

Ms. Clark (then Mrs. Cesspooch, but we will use her maiden name, as she did at the

---

[1]The events which gave rise to the charges against defendant occurred in the town of Randlett, Utah. Although the township of Randlett is within the boundaries of the Uintah-Ouray Reservation, the evidence at trial was that some lots within the town are no longer Indian country because they have passed from trust status to fee ownership by non-Indians. However, these events occurred on a lot assigned by the Tribe to defendant's brother. A witness was called by the government to establish that the site was still within federal jurisdiction after the decision in Hagen v. Utah, 510 U.S. 399 (1994). Trial in the instant case was held in October 1996. The district court's implicit assumption that jurisdiction within the original boundaries of the Reservation, as between the federal authorities and the state, would depend upon the status of the individual lot accurately anticipated our decision in Ute Indian Tribe of the Uintah & Ouray Reservation v. Utah, 114 F.3d 1513, 1529-30 (10th Cir. 1997), cert. denied, 118 S. Ct. 1034 (1998).

time of trial) went to the jail that day, September 9, 1993, to pick up her husband but was told that he had been released earlier than she had expected and he had set out walking for his brother's house in Randlett, Utah, which was about five miles away. Id. at 150-51. She went there to find that Mr. Cesspooch and a number of others were outside the house, drinking and conversing.

Ms. Clark testified that about nine o'clock that evening, defendant and Ms. Clark went into a bedroom in the house and had consensual sexual intercourse. Id. at 155. Afterwards, defendant accused her of having had an affair. He punched her "square in the mouth," knocking her back onto the bed. Id. at 159. After hitting her in the face "over and over," with both of his closed fists, she said, he grabbed a board from a shelf. Id. at 160-63. As she turned on her face trying to avoid the blows, defendant Cesspooch beat her with the board from the shoulders all the way down her body, ending with a blow which broke her toe. He also bit her numerous times during this episode. At some point in the attack defendant also hit Ms. Clark on the abdomen with the board. Then, declaring that he would make sure that she wasn't carrying his baby or anyone else's and that he was going to "rip [her] insides out," defendant tried to insert his hand into her anus, causing a tear in the rectal area.

The assault lasted from about ten-thirty at night until about midnight. Afterwards, defendant went to sleep there in the same room, while Ms. Clark drifted in and out of consciousness for several hours. About five o'clock in the morning, she convinced defendant to let her go to the bathroom. In the hallway she saw defendant's niece, who with help from

3

another woman, managed to get Ms. Clark outside and into a vehicle. They then took Ms. Clark to the local hospital.

Dr. Kent Smith examined Ms. Clark at the hospital. He is a Utah licensed doctor of internal medicine and had been a physician almost six years in the area when he testified. III R. 234-35. He works with private patients and also about 25 to 30 hours a week at the emergency room of the Duchesne County Hospital. Id. at 235. He was working there on the morning of September 10, 1993. Sherron Clark came in because of multiple trauma and said she had been "assaulted multiple times" by her husband with a board, and been hit multiple times about various parts of her body. Id. at 238. Her injuries were consistent with what she told Dr. Smith. Id. at 242. Almost her entire face was swollen, and her nose was misshapen, looking mashed back against her face. The lower side of the orbit around the right eye was fractured, and there were some nasal bone fractures. Id. Ms. Clark had a concussion. Id. at 243. She was sent by ambulance to the University of Utah. Several days later a fracture of the ulna of the left arm was discovered. Id. at 251. Ms. Clark had a superficial tear of the peritoneum of some four to six inches. Id. at 252.

Dr. Stewart, a radiologist who also worked at the Duchesne County Hospital, testified and generally confirmed the testimony of Dr. Smith as to Ms. Clark's condition. III R. 279, et seq.

In his defense, Cesspooch presented testimony by two of his sisters on his nonviolence, evidence outlined in Part III, infra. He also called Danny Anderson who

4

testified that he was a co-worker with Cesspooch in Vernal at the Utah Fieldhouse of Natural History, where Cesspooch came to work in October 1993. III R. at 369. Anderson is a first cousin of Sherron Cesspooch. Anderson said that in late September or early October 1993, Sherron and Alfred Cesspooch were at the museum. There was some discussion regarding Sherron's injuries. Anderson asked her what happened and she looked at him and said "she fell down." Id. at 370. On that occasion Sherron did not mention Alfred Cesspooch causing her any harm. Id. at 370. On cross-examination Anderson said that at the time he inquired about Sherron's injury, she had a cast on her arm from the elbow out to about her fingers. III R. at 371. When Sherron came there at the time of this discussion, Anderson said he believes her eyes were black. When she responded to Anderson's inquiry as to what happened by saying that "she fell down," Anderson said he did not believe her. Id. at 372.

Cesspooch was convicted on jury verdicts of guilty on the three counts and was sentenced to 390 months' imprisonment, 60 months' supervised release, a special assessment totaling $150 and $14,205 in restitution. This appeal followed.

## II

Defendant first contends that his conviction should be reversed because the district judge permitted the prosecution to introduce evidence of prior similar acts of violence by the defendant against Ms. Clark. Defendant contends that the evidence was more prejudicial than probative, that there was no proper purpose for the evidence, and that even if some proper use of the evidence is found, the evidence still should have been excluded because the

5

government did not give proper notice.

We review decisions to admit evidence under Fed. R. Evid. 404(b) for abuse of discretion. United States v. Shumway, 112 F.3d 1413, 1419 (10th Cir. 1997). Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

We apply a four part test to determine whether evidence has been properly admitted under Fed. R. Evid. 404(b). First, the evidence must have been admitted for a proper purpose. Second, it must be relevant. Third, the trial court must have properly balanced the probative value of the evidence against the danger of unfair prejudice, in accordance with Fed. R. Evid. 403. Finally, we look to see that the trial court, on request, gave a proper limiting instruction concerning the evidence. Shumway, 112 F.3d at 1419. The Court staked out these guideposts in Huddleston v. United States, 485 U.S. 681, 691-92 (1988).

The evidence at issue here consists of Ms. Clark's testimony about previous attacks by the defendant upon her, to which we briefly alluded in Part I. In essence, the evidence was of several previous attacks which were similar in some ways to the attack on September 9, although none were so prolonged. In a bench conference prior to opening statements, the district judge found that the evidence was probative to show plan or intent.

6

The government also argued below, and argues on appeal, that the evidence was probative on the matter of identity in that defendant had consistently denied that he had inflicted the injuries on the victim.

We agree that the evidence was properly offered and admitted to prove intent. Mr. Cesspooch had given notice that he intended to use expert testimony to show that he lacked the capacity to form the specific intent required for Counts Two and Three. ( See Part IV, infra.) The evidence was relevant to the issue of intent. See United States v. Joe, 8 F.3d 1488, 1496 (10th Cir. 1993). We are satisfied that the trial court properly balanced the probative value of the evidence against its potential for unfair prejudice. Finally, we note that defendant did not request a limiting instruction at the time that the evidence was offered. The government requested such an instruction, but the district judge declined to give it at the government's request, noting that some defense counsel believe that the limiting instruction may actually be detrimental to the defense because it may draw more attention to the other wrongs evidence. Defendant does not argue that the instruction given at the close of the evidence was improper.

Defendant also argues that he was denied proper notice of the government's intent to use this evidence. Conceding that the government gave notice, his argument is that the notice was deficient because it failed to specify the purpose or purposes for which the government would contend that the evidence could be properly admitted. Defendant appears to contend that the government is required to give notice before trial of the specific grounds on which

7

it will rely for admission of the evidence by our holding in United States v. Kendall, 766 F.2d 1426, 1436 (10th Cir. 1985). We disagree. Rule 404(b) itself requires only that on request the government give notice before trial of the "general nature" of any such evidence it intends to use at trial. In Kendall, we added the requirement that at trial the government "articulate precisely the evidentiary hypothesis by which a fact of consequence may be inferred from the evidence of other acts." Id.[2]

Thus, we are satisfied that defendant received all the pretrial notice to which he was entitled. We also note that defendant has not alleged, much less shown, that he was prejudiced by any deficiency in the notice. Contrary to defendant's contentions, we also find that the government adequately articulated the purpose for the evidence at trial. Furthermore, any inadequacy in the government's proffer was not prejudicial because the trial judge had already opined that the evidence was relevant to show intent, and we conclude that the decision to admit the evidence was not an abuse of discretion. See United States v. Record, 873 F.2d 1363, 1375 n. 7 (10th Cir. 1989).

Finally, we would be inclined to view any error in admission of this evidence as harmless. The other wrongs evidence, whatever impact it may have had, pales beside the evidence of the brutality used in commission of the charged offenses. This observation leads

---

[2]Kendall was decided before Huddleston v. United States, 485 U.S. 681 (1988), which we have since recognized as the controlling authority on application of Rule 404(b). However, we have recognized that the precise articulation required by Kendall is consistent with the Court's pronouncements in Huddleston. United States v. Record, 873 F.2d 1363, 1375 n. 7 (10th Cir. 1989).

us to the conclusion that there was no abuse of discretion because the trial judge's balancing of the probative value and potential for unfair prejudice was not in error, as we have already noted. At worst, however, we are satisfied that any error was harmless.

## III

Next defendant contends that he was wrongly precluded from eliciting testimony as to his good character. We find that this argument has no merit. Defendant called two of his sisters to testify about his generally peaceful character. Hanna Jenks testified that she had never seen defendant strike Sherron, and Sherron did not tell Hanna defendant had been violent towards her. Nor had she seen defendant strike his children or Hanna's children. III R. at 358-360. Rose Serawop, another sister of defendant, testified that she never saw defendant strike Sherron and never saw them "fight or argue or anything like that." Id. at 365-66.

The only restriction on this line of testimony was that an objection was sustained to a question as to the kind of father defendant was. Under this ruling the testimony was confined to the trait of violence and, after that, Hanna was permitted to say she had not seen defendant strike his children or Hanna's. Id. at 359.

In this connection, defendant relies on Michelson v. United States, 335 U.S. 469, 476 (1948), and its recognition of a defendant's right to "introduce affirmative testimony that the general estimate of his character is so favorable that the jury may infer that he would not be likely to commit the offense charged."

9

As noted, the trial judge here sustained a general relevance objection when Hanna was asked about "what sort of father would you describe Alfred as?" III R. at 359. After that the favorable testimony for defendant was permitted that Hanna had not seen defendant strike her children or his own. Id. There was no offer of proof thereafter of a "general estimate of [defendant's] character" to build a premise for a claim of error in exclusion of evidence, and in view of the testimony admitted, we find no error.

**IV**

Finally, defendant contends that he was denied the right to present evidence which would have tended to show that he did not have the capacity to form the specific intent which was an element of Counts 2 and 3. As ordered by the trial judge, defendant had been examined by the government's psychiatrists three times at the United States Medical Center for Federal Prisoners in Springfield, Missouri, prior to trial. He had also been examined by a psychologist whom defense counsel apparently had planned to call to testify as an expert at trial.

Although defendant now contends that the testimony of his expert was improperly excluded at trial, the record does not permit this assertion. The trial court did deny, without written explanation, defendant's effort to raise an insanity defense at trial, but defendant never attempted to call his psychologist to give evidence which would have supported a diminished capacity defense. The court's pretrial ruling excluding the insanity defense did not, by its terms, reject the diminished capacity defense. Defendant did not even attempt to

10

call the witness, much less make the kind of offer of proof required by Fed. R. Evid. 103(a)(2). We will not indulge in an assumption that the trial judge would have excluded such evidence had it been offered, and we do not know what such testimony would have stated. It is fundamental that we will not reverse a conviction on grounds not raised below unless we find plain error which substantially infringes a substantial right. In the circumstances presented here we certainly cannot find plain error.

## Conclusion

For the reasons we have stated herein, the judgment of the district court is **AFFIRMED.**

Entered for the Court


William J. Holloway, Jr.
Circuit Judge