**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 13 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

TUAN M. PHAM,

Defendant-Appellant.

No. 00-3275

D. Kan.

(D.C. No. 99-10110-02)

---

**ORDER AND JUDGMENT** *

---

Before **HENRY** , **BALDOCK** , and **BRISCOE** , Circuit Judges.

---

After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for decision on the briefs without oral argument. See Fed. R. App. P. 34(f). The case is therefore submitted without oral argument.

Tuan M. Pham was charged by indictment with fifteen counts related to four different robberies in Wichita, Kansas: (1) the robbery of Airport Ampco

---

* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Parking on June 3, 1999; (2) the robbery of After Dark Video on July 11, 1999; (3) the robbery of Radio Shack on July 21, 1999; and (4) the robbery of Prologic Computer Store on August 3, 1999. After a jury trial, Mr. Pham was convicted of fourteen of the fifteen counts [1] and was sentenced to a term of imprisonment of 1,076 months. On appeal, Mr. Pham argues that the district court erred in allowing the government to introduce evidence of a prior robbery and that the district court erred in denying his motion to suppress evidence and statements obtained after a search of his girlfriend's apartment. We affirm.

---

[1] More specifically, Mr. Pham was convicted of one count of conspiracy to commit robbery, a violation of 18 U.S.C. § 1951; one count of conspiracy to use a firearm during and in relation to a crime of violence, a violation of 18 U.S.C. § 924(o); four counts of interference with commerce by robbery, a violation of 18 U.S.C. § 1951 and § 2; four counts of carrying a firearm during and in relation to a crime of violence, a violation of 18 U.S.C. § 924(c)(1)(A) and § 2; three counts of brandishing a firearm during and in relation to a crime of violence, a violation of 18 U.S.C. § 924(c)(1)(A)(ii) and § 2; and one count of unlawful possession of a firearm by a felon, a violation of 18 U.S.C. § 922(g)(1).

I.

The first issue raised on appeal is whether the district court erred in permitting the government to introduce evidence of a prior robbery. Under Federal Rule of Evidence 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the *character* of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b) (emphasis added). However, evidence of other crimes may be admitted "for *other* purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Id. (emphasis added). "We review the district court's admission of evidence under [Rule] 404(b) for an abuse of discretion." United States v. Wilson, 107 F.3d 774, 782 (10th Cir. 1997). "An abuse of discretion occurs when a judicial determination is arbitrary, capricious[,] or whimsical." United States v. Shumway, 112 F.3d 1413, 1419 (10th Cir. 1997) (internal quotation marks omitted). "If the admission [was] erroneous, however, we will not disturb [Mr. Pham's] conviction if the error [was] harmless. An erroneous admission of evidence is harmless unless it had a 'substantial influence' on the outcome or leaves one in 'grave doubt' as to whether it had such effect." United States v. Bornfield, 145 F.3d 1123, 1131 (10th Cir. 1998) (citations omitted).

At trial, the government presented – over Mr. Pham's objection – the following evidence concerning a prior robbery. Kyle Ballantine testified that, in

October 1995, Mr. Pham approached him and asked if he "would be interested in making some easy money." Rec. vol. III, doc. 85, at 90 (trial testimony of Mr. Ballantine). According to Mr. Ballantine, Mr. Pham's plan was to rob a Total convenience store, at which Mr. Pham had once been an employee, in Andover, Kansas.

Mr. Ballantine further testified that he and Mr. Pham did, in fact, carry out the plan. During the course of the robbery, Mr. Pham pulled a handgun on the clerk working at the store. Mr. Pham directed the clerk to the store's back area where a closet was located, asked the clerk to get inside the closet, and then proceeded to tie the clerk up with a speaker wire that he had brought with him. Afterwards, Mr. Pham disrupted the store's surveillance system. Mr. Ballantine and Mr. Pham then went through the store, taking merchandise from the shelves and money from the cash register and safe.

In a written order, the district court explained that evidence of the prior robbery was properly admitted under Rule 404(b) because "the similarity between [the prior robbery] and the conduct charged in this case tended to show that the *same* person committed both offenses." Rec. vol. I, doc. 73, at 1 (memorandum and order, filed Aug. 14, 2000) (emphasis added). In short, the prior robbery was

relevant in establishing identity with respect to the four charged robberies. [2]

Mr. Pham disagrees. According to Mr. Pham, "[n]othing in the records shows the prior [robbery] to be *so* similar in nature that *only* the same person could have committed the [four charged robberies]." Aplt's Br. at 10 (emphasis added). Without sufficient similarity, evidence of the prior robbery was not proof of identity but rather proof of bad character only and, as a general matter, character evidence is not admissible. See Fed. R. Evid. 404(a) ("Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion . . . .").

In response, the government contends that district court correctly concluded that the evidence served a proper noncharacter purpose – i.e., proof of identity. The government asserts,

> Here, the evidence of [Mr.] Pham's prior robbery of the Total [convenience store] and the robberies charged at trial share [at] least two distinct features such that they demonstrate a 'signature quality,' the geographic location and the defendant's common practice of binding and/or placing victims in small rooms during the robberies. These common practices are sufficiently distinctive as to be probative of identity.

---

[2] Mr. Pham's defense at trial was that "Mark" – a man who was similar in appearance to himself – was responsible for the four robberies. See Rec. vol. VI, doc. 88, at 509 (testimony of Mr. Pham); id. at 545 (testimony of defense witness, Mr. Battle). One of the government's witnesses, however, testified that "Mark never existed[;] [i]t was just a name that was made up between me and Mr. Pham to use in front of people that we did not know so they would not use our real names." Rec., vol. IV, doc. 86, at 280 (testimony of Mr. Billings).

Aple's Br. at 15-16.

Under this court's case law, "evidence of another crime is probative only if the 'other crime' is similar to the crime charged – but the two crimes need not be identical. If the crimes share elements that possess 'signature quality,' evidence of the 'other crime' may be admitted." United States v. Gutierrez, 696 F.2d 753, 755 (10th Cir. 1982) (citations omitted). "Elements relevant to a 'signature quality' determination include the following: geographic location, the unusual quality of the crime, the skill necessary to commit the acts, or use of a distinctive device." Shumway, 112 F.3d at 1420 (citations omitted). This list, of course, is not exhaustive, but it does serve to underscore an important point: For evidence of a prior crime to be admissible to prove identity with respect to the crime charged, "'[m]uch more is demanded than the mere repeated commissions of crimes of the same class . . . . The pattern and characteristics to the crimes must be *so unusual and distinctive* as to be like a signature.'" United States v. Connelly, 874 F.2d 412, 417 (7th Cir. 1989) (quoting McCormick on Evidence § 190, at 559-60 (3d ed. 1984)) (emphasis added); see also United States v. Myers, 550 F.2d 1036, 1045-46 (5th Cir. 1977) (noting that the other crime and the crime charged must "bear such peculiar, unique, or bizarre similarities as to mark them as the handiwork of the same individual") (internal quotation marks omitted).

As noted above, the government in the instant case points to two elements

-6-

shared by the prior robbery and the four charged robberies that gave rise to a

"signature quality": (1) the geographic location and (2) the practice of binding

and/or placing victims in small rooms. Although we question the distinctiveness

of these similarities, at least in the case at hand, [3] we need not decide whether they

_____

[3] With respect to the geographic location, we note that the prior robbery took place in Andover, Kansas, while the four charged robberies took place in Wichita, Kansas. Though Andover is not far from Wichita (approximately twenty miles), that fact does not make the prior robbery and the four charged robberies particularly distinctive. This was not a situation in which the prior crime and the offense charged occurred at the same exact address or in which the prior crime and the offense charged took place in an unusual geographic location. See, e.g., Shumway, 112 F.3d at 1420 (same archaeological site out of 22,000 in the county); United States v. McGuire, 27 F.3d 457, 461 (10th Cir. 1999) (medium-sized Midwestern cities containing a small branch bank with few employees and with easy access to an interstate highway located near the parking area of a shopping center); United States v. Sanchez, 988 F.2d 1384, 1394 (5th Cir. 1993) (same exact address); United States v. Porter, 881 F.2d 878, 887 (10th Cir. 1989) (small rural Kansas communities).

With respect to the practice of binding victims and/or placing them in small rooms, we note that one of the charged robberies did not involve either any binding or confining. When After Dark Video was robbed, one victim (a customer) managed to escape and so was never subject to the practice, but the other victim (an employee) was never tied up or taken to a small room. Furthermore, we point out that the practice of binding victims and/or placing them in small rooms does not seem "so unusual and distinctive as to be like a signature." Connelly, 874 F.2d at 417 (internal quotation marks omitted). That is, it does not seem particularly unusual for victims of a robbery to be restrained by offenders in such a fashion. Cf. United States v. Bailey, 111 F.3d 1229, 1234, (5th Cir. 1997) (agreeing with the defendant "that the facts that the women were all single and were physically touched in some way while they were sleeping is not compelling because these are characteristics shared by a number of sexual assaults"; but ultimately concluding that there was a "signature quality" because of "the location and timing of each intrusion – Fort Hood during pre-dawn

(continued...)

rose to the level of a "signature quality." Even if the offenses lacked a "signature quality," such that evidence of the prior robbery was not admissible under Rule 404(b), we conclude that the introduction of the evidence was harmless error.

We take note first of the "substantial evidence" pointing to Mr. Pham's guilt. United States v. Oberle, 136 F.3d 1414, 1419 (10th Cir. 1998). Witnesses in all four robberies identified Mr. Pham as the offender in photographic lineups. Christopher Billings testified not only that he was Mr. Pham's accomplice in three of the four robberies but also that Mr. Pham had confessed to the fourth robbery. Finally, physical evidence seized from the residence of Mr. Pham's girlfriend linked Mr. Pham to the four offenses. In addition, we take note of the limiting instruction given to the jury after evidence of the prior robbery had been introduced. See id. (holding that the error in admitting evidence did not require reversal in part because a limiting instruction was given). The district court informed the jury that "the mere fact that a defendant may have committed a similar act in the past is not evidence that he committed such acts in this case. The Defendant is only on trial for the crimes charged and for those offenses alone. *You may not convict a person simply because you believe he may have committed some acts, even bad acts, in the past*." Rec. vol. III, doc. 85, at 98

(...continued)
hours").

(limiting instruction, given at the conclusion of the direct examination of Mr. Ballantine) (emphasis added).  Because of the substantial evidence of Mr. Pham's guilt and this limiting instruction, we conclude that any error in admitting evidence of the prior robbery was harmless.

II.

The second issue raised by Mr. Pham is that the district court erred in denying his motion to suppress the evidence obtained through a search of his girlfriend's apartment.  We review a denial of a motion to suppress – at least with respect to the district court's factual findings – for clear error.  However, we review de novo "[t]he ultimate conclusion of the reasonableness of a search and seizure under the Fourth Amendment."  United States v. Eylicio-Montoya, 18 F.3d 845, 848 (10th Cir. 1994).

In a written order, the district court made the follow factual findings with respect to the search at issue.  On August 6, 1999, members of the FBI Violent Crimes Task Force – including FBI Special Agent Charles Pritchett and Detective Michael Hennessy of the Wichita Police Department – were sent to 639 North Bebe in Wichita, Kansas, in search of a suspect by the name of "Tuan."  The Task Force believed "Tuan" to have been involved in a series of armed robberies.  The

-9-

residence at 639 North Bebe was leased to a woman named Jamilabi Abdul, who was known to be "Tuan's" girlfriend.

Upon arriving at the apartment, Agent Pritchett and Detective Hennessy saw a red car that matched the description they had been given of "Tuan's" car. Believing "Tuan" to be armed and dangerous, Agent Pritchett and Detective Hennessy decided to create a ruse to lure him out of the apartment. They called two uniformed officers to the scene to assist them, and Detective Hennessy – who was in plain clothes – stationed his car next to the red car, pretending that he had hit it. The uniformed officers knocked on Ms. Abdul's door and, when she answered, asked if the red car belonged to her as it had been involved in an accident. Ms. Abdul said it was her car and went outside to investigate the staged false accident. For a few minutes, she spoke with Mr. Hennessy, who was posing as the person responsible for the accident. The uniformed officers then asked Ms. Abdul to get her insurance papers so that they could write up a report, and so Ms. Abdul went back into the apartment. (During the conversation between Ms. Abdul and the others, Agent Pritchett was hiding out of sight at the side of the house.)

At this point, Detective Hennessy and Agent Pritchett decided that it was not worthwhile to continue the ruse as "Tuan" had not come out of the apartment. The two knocked on Ms. Abdul's door – with the uniformed officers a short

distance behind – and, when she answered, identified themselves as agents of the FBI Violent Crimes Task Force. They asked Ms. Abdul if "Tuan" was inside and she responded "no." Detective Hennessy then asked if they could "come in and take a look." Rec. vol. II, doc. 51, at 23 (testimony of Detective Hennessy). In response, Ms. Abdul stepped back and said "yes." Detective Hennessy, Agent Pritchett, and the uniformed officers thus entered the residence.

Upon entering, Detective Hennessy and Agent Pritchett went up the stairs to investigate while the uniformed officers went downstairs. Detective Hennessy found nothing upstairs and so returned down the staircase a few minutes later. When he did so, he saw that the uniformed officers had Mr. Pham in custody. The officers told Detective Hennessy that Mr. Pham had been discovered downstairs.

After Mr. Pham had been arrested, Detective Hennessy asked Ms. Abdul who was the person the officers had found. Ms. Abdul said that the man's name was "Kyle." After several more minutes of conversation, Ms. Abdul admitted that the man was in fact "Tuan" – more specifically, Tuan Pham. Detective Hennessy then told Ms. Abdul that "[they] were interested in doing a search of her apartment while [they] were there because [they] felt like there was stolen property inside." Id. at 28 (testimony of Detective Hennessy). He asked Ms. Abdul for permission to search, and Ms. Abdul replied that "she'[d] do it." Id. at

29 (testimony of Detective Hennessy). In addition to her oral consent, Ms. Abdul

gave to Detective Hennessy her written consent – i.e., she signed a "waiver of

search" form. The search that followed yielded physical evidence linked to the

four robberies.

On appeal, Mr. Pham argues that the evidence seized from the apartment

should not have been admitted because (1) Ms. Abdul did not know that Detective

Hennessy and Agent Pritchett were law enforcement officers when she granted

them permission to enter the apartment, (2) Ms. Abdul never consented to the two

uniformed officers' entering the apartment, and (3) Ms. Abdul only allowed

Detective Hennessy and Agent Pritchett to enter the apartment – i.e., she

consented only to their entrance, not to their search of the residence for Mr.

Pham.[4] The difficulty with Mr. Pham's arguments is that each one contradicts the

---

[4] We should note that the government has not challenged Mr. Pham's
standing with respect to the search of his Ms. Abdul's apartment. Thus, we
proceed with the assumption that Mr. Pham did have a reasonable expectation of
privacy in the apartment. See United States v. Kapperman, 764 F.2d 786, 791 n.6
(11th Cir. 1985) ("Given the government's failure to raise this question [of
standing for purposes of the Fourth Amendment], we do not address it.").

This assumption is largely borne out by the evidence presented at the
suppression hearing, in which Mr. Pham testified that he "stayed there most
nights." Rec. vol. II, doc. 51, at 105 (testimony of Mr. Pham); see also id. at 98
(testimony of Ms. Abdul) (stating that Mr. Pham stayed with her a few nights, off
and on). In Minnesota v. Olson, 495 U.S. 91 (1990), the Supreme Court stated
"[the defendant's] status as an overnight guest is alone enough to show that he
had an expectation of privacy in the home that society is prepared to recognize as
(continued...)

factual findings made by the district court. Our review of the record does not persuade us that the district court made any clear error with respect to these factual findings. While Ms. Abdul and Mr. Pham gave testimony at the suppression hearing that supports Mr. Pham's arguments, the district court explicitly rejected their testimony as not credible. See United States v. Gama-Bastidas , 142 F.3d 1233, 1239-40 (10th Cir. 1998) ("[J]udging the credibility of the witnesses, determining the weight to be afforded the testimony, and drawing reasonable inferences and conclusions from the testimony are within the province of the district court.").

III.

The final issue raised by Mr. Pham is that the district court erred in denying his motion to suppress statements made to the police regarding the evidence seized from Ms. Abdul's apartment. In essence, Mr. Pham argues that his statements should have been excluded because the search of Ms. Abdul's apartment was not legal. (Mr. Pham does not assert a Fifth Amendment violation, only a Fourth Amendment one.) Because we have concluded that the search of Ms. Abdul's apartment did not violate the Fourth Amendment, Mr. Pham's

_____

(...continued)
reasonable." Id. at 96-97.

-13-

argument must fail.  A valid search cannot bear "fruit of the poisonous tree."         See

United States v. Lewis   , 24 F.3d 79, 82 (10th Cir. 1994) (holding that defendant's

statements to the police after     Miranda  warnings were not "fruit of the poisonous

tree," where the automobile search which the defendant asserted to be the

poisonous tree was valid).


IV.

Accordingly, we AFFIRM the judgment of the district court.


Entered for the Court,


Robert H. Henry
Circuit Judge