Marco RIVERA, Plaintiff,

v.

Henry RIVERA, Defendant.

No. 01–2335 JPO.

United States District Court, D. Kansas.

May 13, 2003.

to t

Thomas F. McGraw, III, Thomas F. McGraw III, Chartered, Mark C. Owens, Overland Park, KS, for Defendant.

Donald M. McLean, Hayes & Kieler, L.L.C., Overland Park, KS, for Plaintiff.

### MEMORANDUM AND ORDER

#### I. Introduction.

This is a sexual battery lawsuit.[1] In August 2002, following a three-day trial, the jury returned a verdict in favor of the defendant, Henry Rivera. The plaintiff, Marco Rivera, has filed a motion for new trial (**doc. 48**). The court, having carefully reviewed plaintiff's motion and supporting memorandum, defendant's memorandum in opposition (doc. 50), plaintiff's reply memorandum (doc. 53), and the trial transcript (docs. 54, 55, & 56), now is prepared to rule.[2] As explained below, the court will grant plaintiff's motion and set this case for a status conference to discuss scheduling a new trial.

#### II. Factual Background.

Enrique Rivera and his first wife, Carmen Munoz, had three children, namely, Blanca, Miriam, and Henry Rivera. Subsequently, Enrique and his second, common-law wife, Lucia Rivera, had seven more children, namely, Alex, Siboney, Lidia, Elizabeth, Marco, Magdalena, and Julio Rivera. Highly summarized, this civil lawsuit involves the contention of plaintiff Marco Rivera that he was sexually abused many years ago by his older half-brother, defendant Henry Rivera.

Specifically, Marco contends that he was forcibly and repeatedly sodomized by Henry during a period of several months in the spring and summer of 1988 when Marco was seven years old and Henry was twenty years old. By the time of trial in August 2002, both Marco and Henry of course were adults.

Marco testified that he did not report the incidents of abuse to his parents, siblings, or anyone else because Henry had threatened to "beat the shit out of" him if he told anyone. Eventually, however, Marco's mother, Lucia Rivera, discovered some disturbing blood stains in Marco's underwear while she was doing the family laundry. Lucia questioned Marco about the blood, examined his rectal area and, in October 1988, took Marco to the hospital.

At the hospital, Marco was diagnosed with and treated for venereal warts that may have been sexually transmitted. The visit to the hospital understandably spurred law enforcement officials to inquire into the origin of the venereal warts. Ultimately, Henry was arrested for and charged with aggravated criminal sodomy and indecent liberties with a child in the District Court of Wyandotte County, Kansas. Marco testified in this civil trial that, after the sexual abuse was discovered,

1. The court has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). The parties have consented to the undersigned magistrate judge trying this case and entering judgment pursuant to 28 U.S.C. § 636(c)(1).

2. Although counsel had fully briefed the instant motion by mid-September 2002, unfortunately the trial transcript was not completed and filed by the contract court reporter until mid-February 2003. This accounts for the unusually long period of time required to rule on the motion.

Marco thought Henry was going to kill him.

For approximately the next two years after Henry was first charged criminally, Marco went to counseling sessions with Paula Kahmann, a mental health counselor employed by the Wyandotte County Mental Health Center. During these counseling sessions, Marco frequently discussed in detail episodes of abuse inflicted by Henry. However, on one occasion, on April 4, 1989, Marco told Kahmann, "I made it up." At trial, Marco explained that he told Kahmann this because his father, Enrique, had told him to do so. Marco was terrified of his father, explaining, "If you didn't do what he said, he'd basically beat the hell out of you."

At trial, Henry denied that he ever had sexually abused Marco. Also, Henry testified that, for approximately six weeks before the abuse of Marco was discovered, Henry had been residing with his mother, Carmen Munoz, and not in Enrique and Lucia Rivera's home in Kansas City, Kansas where Marco lived and where the sexual abuse allegedly occurred. Henry explained that his father, Enrique, essentially "arranged" things so that Henry had to accept responsibility for the abuse. According to Henry, Enrique and Lucia "handled everything" after the venereal warts were discovered and Henry had "no say-so on what was going on." Enrique supposedly did not want Henry to go to jail and, ultimately, Henry entered into a diversion agreement, pursuant to which the above-described criminal charges later were dismissed after Henry completed a probationary period. Enrique paid for Henry's lawyer and also gave Henry money to pay the Wyandotte County Mental Health Center, which apparently was a requirement of Henry's diversion agreement. Although there was a no-contact order prohibiting Henry from having contact with Marco during the time period immediately following the discovery of the alleged sexual abuse, Enrique and Lucia routinely permitted Henry to be around Marco.

As part of Henry's diversion agreement, he was required to attend group and private therapy sessions on a weekly basis for two years. Kahmann also was Henry's mental health counselor. During one of these counseling sessions, Henry told Marco, "I am sorry for what I did to you." Henry explained that he had been told that he merely needed to apologize to Marco in order to "get on with [his] diversion." Kahmann, however, testified that she never doubted that Marco had been sexually abused, and further that she never doubted that Henry in fact was the perpetrator who had sexually abused Marco.

Enrique, an uneducated man, was a successful entrepreneur. Despite success in this respect, the uncontroverted evidence of both parties demonstrated that Enrique, a former small-time professional boxer and street fighter in Mexico, was an extremely dominating and controlling man who often physically, mentally, and sexually abused his children as well as his second, common-law wife, Lucia.

For example, on one occasion, Lucia was in the process of leaving Enrique and taking her children with her. During this incident, Enrique tried to throw one of his sons, Alex, into a brick wall. Then, Enrique and Alex were literally fighting over physical control of Julio, who was a baby at the time; both Enrique and Alex let go at the same time and dropped Julio, fracturing Julio's skull. Enrique then tried to shoot at his family with a gun as they were running down the street away from him. Other times, when Lucia would express concern that her daughters were not safe from Enrique, he would put a gun to her head or beat her.

According to Henry, Enrique once struck him in the face with a gun and broke his nose. Indeed, Henry testified that Enrique broke his nose several times. Enrique once even struck Henry in the head with a hammer. On other occasions, Enrique hit Henry with a board, a whip, a branch, and a belt. He once threw Henry into a wood stove. When Henry was about sixteen years old, Enrique hit him in the leg with a pipe and he was hospitalized for three weeks.

Enrique also was prone to inflicting physical abuse on Marco, though not as severely as he would beat Henry. According to Marco, he was beaten frequently by Enrique with a leather belt.

Enrique often beat his daughter, Miriam. She testified that Enrique punched and kicked her. He gave her black eyes and once broke her nose. After Enrique broke her nose, Miriam asked him to take her to the hospital, but he refused. Finally, about one week later, Enrique dropped Miriam off at Truman Medical Center in Kansas City, Missouri and told her to tell the people at the hospital that some wood pallets had fallen on her while she was working in Enrique's pallet shop. Personnel at the hospital implored Miriam to tell them the truth. But Miriam did not want to get beaten again after she was released from the hospital, and accordingly she told hospital personnel that the pallets had fallen on her. Miriam testified that Enrique physically abused her, on average, approximately three times per week for many years.

In addition to being physically abusive, Enrique was verbally and mentally abusive. Evidently unimpressed with Henry's academic potential, Enrique mandated that Henry drop out of school during his first semester of high school and then put him to work in the family business. Henry worked approximately six days per week, fourteen hours per day, repairing crates, pallets, and "skids."

Similarly, Enrique removed Miriam from school when she was fourteen years old after she had completed the sixth grade. Enrique put Miriam to work in the family restaurant, cooking and washing dishes from 6:00 a.m. until the bar closed, which was often around 11:00 p.m. or midnight. After the restaurant closed in 1983, Enrique put Miriam to work in the shop repairing pallets and skids. Miriam worked in the shop for four or five years, and then assisted Enrique in fixing up houses by putting up sheetrock, fixing toilet seats, painting, etc.

The evidence at trial was uncontroverted that Enrique sexually abused at least two of his six daughters. Miriam testified that her sexual relationship with her father began when she was fourteen or fifteen years old. Based on Miriam's birthdate, this would have been in approximately 1980 or 1981. Enrique started by "playing around" and touching Miriam, and later he made her perform fellatio. The two had sexual intercourse, both vaginal and anal. This sexual activity occurred in the family home and in the pallet shop next door. Miriam testified that Enrique's preferred method of intercourse was anal, and that she had intercourse with Enrique on "hundreds of occasions." Miriam testified that her father's sexual abuse of her slowed down in 1988.

Siboney testified that Enrique began sexually abusing her when she was only five or six years old. Based on Siboney's birthdate, this would have been in approximately 1975 or 1976. 'Enrique would fondle Siboney while he masturbated. This occurred during a period of five or six years, but then Siboney started to refuse and fight Enrique. When Siboney was ten or eleven years old, Enrique started forcing her to perform fellatio. She testified: "That happened for a long time." When

Siboney was thirteen or fourteen, Enrique attempted to force her to have intercourse with him, including anal sex. Enrique offered Siboney "a thousand dollars at a time to have sex with him." He offered her money and jewelry and told her that she should "just be more like her sister Miriam" and enjoy herself. Siboney testified that this abuse started to taper off when she was fifteen or sixteen years old, which would have been in 1985 or 1986. Again, this abuse occurred in the family home. Siboney said that she never told her mother (Lucia) about the abuse because Enrique said that he would kill Lucia if Siboney told her about it.

Kahmann testified that, during the period she was counseling Marco and Henry, she was "concerned [Marco] may have been misused by his father, but [she] never doubted he was misused by his brother." She further testified that she would not be surprised to learn that Enrique was abusing females in his household from the time they were five years old. She allowed, however, that if she had known Enrique was an "abuser of children in the anal sense," it might have led her to believe that they should reopen the investigation regarding the sexual abuse of Marco.

Notably, however, there was no evidence at trial—through Henry or otherwise—that he ever had been sodomized by Enrique; all Henry testified to, and not very convincingly at that, was that he awoke one morning and realized that Enrique was at his bedside and fondling his breasts, which were a bit well developed for a male. Further, there was no direct evidence presented, by any witness that they had ever seen or even heard of Enrique having had any sexually inappropriate contact with Marco.

Henry presented some evidence during trial that would support an inference that Marco filed the present lawsuit at least partially out of greed. Enrique died on

October 12, 2000, and Marco filed this lawsuit shortly thereafter, which would have been more than twelve years after the sexual abuse occurred. Most if not all of Enrique's children currently are involved in a separate lawsuit over his estate in the Circuit Court of Jackson County, Missouri. Presumably, if Marco prevails in this litigation, he could recover money or property from Henry's portion of Enrique's estate.

Marco, however, denied any improper motive. Of course, during most of the above-described twelve-year period, Marco was still a minor and under no deadline to file suit. Further, Marco explained that he did not file this lawsuit when Enrique was alive because Enrique led him to believe that he should not make a "big deal" out of the whole incident. When Marco grew up, the more he stayed away from his family, the more he realized that "you don't do that to somebody."

It should be mentioned that there is one trial exhibit from the hospital records that arguably suggests Marco may have never actually been sodomized. That is, the emergency room physical examination notes from Children's Mercy Hospital in Kansas City, Missouri state: "Anus surrounded by large condyloma, anal wink intact. Rectal-no tears, good spincter [sic] tone. Skin otherwise [without] evidence of trauma." Oddly, at trial neither party ever saw fit to call a physician-treating or otherwise-who would have been competent to testify about the full meaning and import of this entry in Marco's medical records. Specifically, neither party called a witness to explain how venereal warts are caused and transmitted, or how Marco could have developed those warts in his anus without having been sodomized.

In any event, as mentioned before, the jury ultimately returned a verdict in Henry's favor. Marco now seeks a new trial on two alternative bases: (1) the jury's

verdict was against the weight of the evidence; and (2) the jury's verdict was affected by the erroneous admission of evidence concerning Enrique's molestation of Miriam and Siboney.

As explained below, the court agrees with Marco that a new trial is warranted because the jury's verdict was clearly against the weight of the evidence at trial. However, the court disagrees with Marco that the evidence of Enrique's sexual abuse of his daughters was erroneously admitted during the first trial, and thus this evidence presumably will be admitted when this case is re-tried.

### III. Analysis and Discussion.

■ Motions for new trials are committed to the sound discretion of the trial court.[3] They are generally regarded with disfavor and should only be granted with great caution.[4] "A party seeking to set aside a jury verdict must demonstrate trial errors which constitute prejudicial error, or that the verdict is not based on substantial evidence."[5] The court will first consider Marco's argument that the August 2002 trial was affected by the erroneous admission of certain evidence.

### A. Whether it was Prejudicial Error for the Court to Admit Evidence of Enrique's Sexual Abuse of Miriam and Siboney.

■ Marco argues that he suffered prejudicial error because the court incorrectly allowed the jury to hear evidence of Enrique's sexual abuse of Miriam and Siboney. A new trial based upon an erroneous evidentiary ruling is warranted only if that error prejudicially affected the substantial rights of a party.[6] Of course, the evidence must also have been admitted in error. In this case, for the reasons explained by the court in its pretrial ruling, and as further explained below, the court remains unpersuaded that it constitutes error to allow Henry to present this type of evidence.[7]

■ Rule 404(b) of the Federal Rules of Evidence provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. **It may, however, be admissible for other purposes, such as proof of motive,** opportunity, intent, preparation, plan, knowledge, **identity,** or absence of mistake or accident.[8]

When determining the admissibility of evidence under Rule 404(b), the court must: (1) determine whether the evidence of other crimes, wrongs, or acts is being introduced for a proper purpose; (2) determine whether the evidence is relevant; (3) make a Rule 403 determination that the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice; and (4) upon request, instruct the jury that the evidence of similar acts is to be considered only for the limited purpose for which it was admitted.[9] Rule

**3.** *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984); *Hinds v. Gen. Motors Corp.*, 988 F.2d 1039, 1046 (10th Cir.1993).

**4.** *Franklin v. Thompson*, 981 F.2d 1168, 1171 (10th Cir.1992).

**5.** *White v. Conoco, Inc.*, 710 F.2d 1442, 1443 (10th Cir.1983).

**6.** Fed.R.Civ.P. 61; *Hidalgo v. Fagen, Inc.*, 206 F.3d 1013, 1020 (10th Cir.2000).

**7.** However, for purposes of any appeal, the court acknowledges that, assuming for the sake of discussion that it was error to admit this kind of evidence, Marco clearly was prejudiced and thus would be entitled to a new trial on that basis.

**8.** (Emphasis added.)

**9.** *Huddleston v. United States*, 485 U.S. 681, 691, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988); *United States v. Morris*, 287 F.3d 985, 990

404(b)'s list of "proper purposes" is illustrative, not exhaustive, and thus the rule is regarded as "an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove *only* criminal disposition." [10]

Before trial, Marco filed a motion in limine seeking to prevent Henry from introducing any evidence regarding sexual relations of other members of the Rivera family. The court ruled that this arguably improper character evidence would be admissible under the Rule 404(b)-identity exception. In retrospect, this evidence also tended to prove Enrique's motive in forcing Henry to "take the fall," so to speak, for the sexual abuse.

Before the court allowed Henry to admit this evidence, the court convened in camera hearings of Miriam and Siboney. This procedure was followed in order that the court could evaluate, outside of the jury's presence, the probative value of the anticipated testimony, the danger of harm to Miriam or Siboney, and the danger of unfair prejudice to any party.

During Miriam's in camera hearing, she stated that she did not object to testifying regarding inappropriate sexual contact between her and her father. She testified that Enrique began having sexual contact with her when she was twelve or thirteen years old, and that this sexual contact continued for approximately eight years. It extended to sexual intercourse on more than one hundred occasions and it included anal intercourse on "many"-*i.e.*, "more than ten"-occasions.

During Siboney's in camera hearing, she stated that Enrique molested her during a ten-year period. It began with fondling when she was about five years old; he forced her to perform fellatio when she was a teenager, but he never succeeded in forcing her to engage in vaginal or anal intercourse. He tried to rape Siboney several times when she was fifteen years old, but she fought him off by, for example, hitting him over the head with something, kicking him, scratching him, biting his penis, or hiding jalapeno peppers in her pocket so that she could rub them on his penis when he forced her down to his genital area. Siboney testified that this sexual abuse occurred "at least four times a week from the time I was 13 until he beat me for the last time when I left the house. It was two days after my 21st birthday." Siboney specifically testified that Enrique attempted to perform anal sex on her, but that she fought him and he never succeeded. Like Miriam, Siboney voiced no objection to testifying before a jury about the sexual abuse by Enrique.

The court found that the in camera testimony by Miriam and Siboney was probative and that the danger of unfair prejudice was substantially outweighed by its probative value. Accordingly, the court proceeded to allow Henry to present their testimony to the jury.

 Generally, a high degree of similarity between the prior act and the present act is required in order for prior acts evidence to be admissible under the Rule 404(b)-identity exception. Although the two acts "need not be identical," they must share a "signature quality." [11] Consider-

---

(10th Cir.), *cert. denied,* 536 U.S. 933, 122 S.Ct. 2612, 153 L.Ed.2d 797 (2002).

**10.** *United States v. Tan,* 254 F.3d 1204, 1208 (10th Cir.2001) (internal quotation omitted); *accord United States v. Patterson,* 20 F.3d 809, 812–13 (10th Cir.1994) (holding the trial court properly admitted evidence of the defendant's prior hijackings where the "primary defense ... was the issue of identity").

**11.** *United States v. Gutierrez,* 696 F.2d 753, 755 (10th Cir.1982); *see also United States v. Pham,* 17 Fed.Appx. 778, 780–81 (10th Cir. 2001) (same; applying the 404(b)-identity exception), *cert. denied,* 534 U.S. 981, 122 S.Ct. 413, 151 L.Ed.2d 314 (2001).

ations relevant to a signature quality determination include "geographic location, the unusual quality of the crime, the skill necessary to commit the acts, or use of a distinctive device."[12] In this case, the court finds that the signature quality requirement was arguably met, as both the prior acts and the current act involved Enrique's incestuous anal penetration or attempted anal penetration of his own minor children, typically in the family home, during a rampage of sexual abuse that lasted for nearly a decade.[13]

Nevertheless, a lower similarity standard probably should apply in this case. The Tenth Circuit has applied the signature quality requirement only in the typical Rule 404(b)-identity case—that is, when the prosecution seeks to introduce evidence of the prior acts as evidence of the accused's character in a criminal case.[14] Under those circumstances, the heightened signature-quality similarity standard is warranted because of the danger that the accused will be unfairly prejudiced by evidence that shows nothing more than his mere criminal disposition. By comparison, this case involves the much more infrequent use of the 404(b)-identity exception to admit so-called "reverse 404(b)-evidence."[15] Evidence is characterized as reverse 404(b)-evidence when a defendant offers evidence under the Rule 404(b)-identity provision against a third person in order to exculpate himself. In reverse 404(b)-evidence cases, such as this one, the person against whom the evidence is being offered is not a party to the case and, therefore, will not be unfairly prejudiced if the evidence is admitted.[16] Therefore, the stringent signature-quality requirement should be relaxed somewhat under these circumstances.

The extensive analysis of this issue by the Third Circuit in *United States v. Stevens*[17] is particularly persuasive. In *Stevens*, the Third Circuit collected case law

12. *United States v. Shumway*, 112 F.3d 1413, 1420 (10th Cir.1997) (citations omitted).

13. *See, e.g., Morgan v. Foretich*, 846 F.2d 941, 944–45 (4th Cir.1988) (holding the district court abused its discretion by excluding evidence that the child plaintiff's half-sister also was sexually abused because it tended to identify their father as the perpetrator); *see also, e.g., United States v. Bailey*, 111 F.3d 1229, 1234 (5th Cir.1997) (affirming the district court's ruling that 404(b)-identity evidence was admissible where the location and timing of each sexual assault, *i.e.*, Fort Hood during pre-dawn hours, was of signature quality); *United States v. Yellow*, 18 F.3d 1438, 1441 (8th Cir.1994) (affirming the district court's ruling that the defendant's prior acts of rape against the victim's siblings were admissible to prove the perpetrator's identity in the current rape prosecution where the defendant tried to implicate another person).

14. *See generally, e.g., Pham*, 17 Fed.Appx. at 778 (applying the 404(b)-identity signature quality exception in a criminal case); *United States v. Scott*, 185 F.3d 876 (unpublished table opinion), *text available at* 1999 WL 546783 (10th Cir. June 1, 1999) (same); *Shumway*, 112 F.3d at 1413 (same); *United States v. Taylor*, 108 F.3d 341 (unpublished table opinion), *text available at* 1997 WL 82473 (10th Cir. Feb.27, 1997) (same); *United States v. Cosby*, 94 F.3d 656 (unpublished table opinion), *text available at* 1996 WL 467652 (10th Cir. Aug.15 1996) (same); *Patterson*, 20 F.3d at 809 (same); *see also, e.g., United States v. Jackson*, 863 F.Supp. 1462 (D.Kan.1994) (same).

15. Although the reverse 404(b)-identity exception is typically applied in criminal cases, it applies equally in civil cases. *See, e.g., Agushi v. Duerr*, 196 F.3d 754, 759–61 (7th Cir.1999) (explaining that the reverse 404(b)-identity exception also applies in a civil case).

16. *See generally* 1 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 115, at 685 (2d ed.1994) (explaining that, under these circumstances, "risks of unfair prejudice do not appear or take on a very different shape").

17. 935 F.2d 1380 (3d Cir.1991).

in which courts have considered reverse 404(b)-evidence and concluded:

> It is well established that a defendant may use similar other crimes evidence defensively if in reason it tends, alone or with other evidence, to negate his guilt of the crime charged against him. In our view, the most persuasive treatment of reverse 404(b) evidence is found in [*State v.*] *Garfole*, [, 76 N.J. 445, 388 A.2d 587 (1978) ], wherein the New Jersey Supreme Court observed that a lower standard of similarity should govern reverse 404(b) evidence because prejudice of the defendant is not a factor. We agree with the reasoning of *Garfole* and with its holding that the admissibility of reverse 404(b) evidence depends on a straightforward balancing of the evidence's probative value against considerations such as undue waste of time and confusion of the issues. Recasting this standard in terms of the Federal Rules of Evidence, we therefore conclude that **a defendant may introduce reverse 404(b) evidence so long as its probative value under Rule 401 is not substantially outweighed by Rule 403 considerations.**[18]

In determining the probative value of this evidence, the court is also mindful of the principles underlying Rules 413, 414, and 415 of the Federal Rules of Evidence. These rules generally provide that, when a defendant is accused of sexual assault or child molestation, evidence regarding the defendant's other offenses of sexual assault or child molestation is admissible.[19] Admittedly, these rules are inapplicable here because they technically only apply to extrinsic offenses of a "defendant" or a "party," whereas the evidence at issue in this case was of a non-party's extrinsic offenses. However, these rules collectively embody a recognition that other acts of sexual abuse and child molestation are very probative in sexual assault and child molestation cases. As explained by the legislative history:

> In child molestation cases, . . . **a history of similar acts tends to be exceptionally probative because it shows an unusual disposition** of the defendant—a sexual or sadosexual interest in children—**that simply does not exist in ordinary people.** Moreover, such cases require reliance on child victims whose credibility can readily be attacked in the absence of substantial corroboration. In such cases, **there is a compelling public interest in admitting all significant evidence** that will illumine the credibility of the charge and any denial by the defense.[20]

---

**18.** *Id.* at 1404–05 (citations, quotations, and footnote omitted; emphasis added). *See also* 1 Mueller & Kirkpatrick, *supra* note 16, in which the authors discuss various considerations in the context of reverse 404(b)-evidence and similarly conclude:

> [P]roof of third-party crimes should be admissible more often than is indicated by the usual *"modus operandi"* theory. So long as the crime or crimes by a third person are sufficiently similar to the charged crime to suggest a fair increase in the likelihood that the third person committed the charged offense, the standard of relevancy is satisfied and the evidence should be admitted unless exclusion is warranted under FRE 403 because risks of prejudice or confusion of issues.

§ 115, at 686–87 (footnotes omitted).

**19.** "These rules were explicitly designed to allow parties to introduce evidence of prior sex crimes in order to prove propensity." *United States v. LeMay*, 260 F.3d 1018, 1032 (9th Cir.2001) (citing legislative history), *cert. denied*, 534 U.S. 1166, 122 S.Ct. 1181, 152 L.Ed.2d 124 (2002). They reverse the traditional rule of excluding character evidence and create a presumption in favor admitting this evidence. *United States v. Enjady*, 134 F.3d 1427, 1431 (10th Cir.1998).

**20.** Fed.R.Evid. 413 historical notes, congressional discussion (emphasis added).

■ Thus, in this case, the fact that Enrique performed or forcibly attempted to perform anal intercourse on his own minor children shows a sadosexual, incestuous interest "that simply does not exist in ordinary people." Although this is character evidence that shows Enrique's unusual disposition, it is also probative of the identity of who, if anyone, sodomized Marco. And it is probative in this case because it is uncontroverted that Enrique was a serial (not just an occasional) child molester and, by comparison, there was no evidence offered that Henry has ever committed an extrinsic sex crime.

Of course, the probative value of such "other acts" evidence nevertheless continues to depend upon the similarity of the prior acts and the current acts charged.[21] In this case, Enrique's sexual abuse of Miriam and Siboney and the sexual abuse alleged by Marco were dissimilar in that the victims in the former context were female whereas the victim in the latter context was male. But the acts were similar in many respects. Most notably, all involved Enrique's incestuous anal penetration or attempted anal penetration of his own children, usually in the family home. Enrique began fondling Siboney when she was five or six years old and, likewise, the sexual abuse of Marco occurred at a young age when he was seven years old. Also, the testimony of Miriam and Siboney demonstrates that Enrique was on a rampage of sexual abuse that lasted for nearly a decade. Enrique's sexual abuse of both Miriam and Siboney escalated during the mid 1980s. His sexual abuse of Siboney subsided in 1985 or 1986, and his sexual abuse of Miriam subsided in approximately 1988. Consistent with that time frame, Marco repeatedly was sexually abused during the spring and summer of 1988. In sum, the court is persuaded that the evidence regarding Enrique's sexual abuse of Miriam and Siboney is probative of the identity of Marco's assailant. Therefore, the court must proceed to weigh the probative value of this evidence against Rule 403 considerations.

There was no risk that Enrique would be unfairly prejudiced by this evidence because he was not a party to the case. In fact, he died before trial. Thus, as a practical matter, the most significant Rule 403 consideration was the very real danger that jurors might overvalue this evidence (which, as it turned out, could account for the startling defense verdict in this case). Overall, though, the court was unpersuaded, and remains unpersuaded, that this evidence is too misleading to warrant excluding it. Theoretically at least, the jurors were entitled to infer what they wished from this evidence. They could have believed Marco's testimony that he was abused by Henry and disregarded the value of the evidence regarding Enrique's sexual abuse of his daughters because Marco was one of Enrique's sons rather than one of his daughters. They also could have inferred that Marco was sodomized by both Henry and by Enrique. Or, they could have inferred that, because of Enrique's other abusive, incestuous relationships with his other children, it was more likely than not that Marco was abused only by Enrique, and not by Henry, and that Marco is now attempting to use the entire incident as a means to obtain money; apparently, the jury adopted this inference. Ultimately, the court is unpersuaded that the probative value of this evidence was substantially outweighed

---

**21.** Under Rules 413–415, the probative value of such evidence depends upon considerations such as the similarity of the prior acts and the present acts, the closeness in time of the prior acts and the present acts, the frequency of the prior acts, and the presence or lack of intervening events. *United States v. Guardia,* 135 F.3d 1326, 1331 (10th Cir.1998).

by any considerations that would require it to be excluded.

In sum, the court believes that this evidence was offered for a proper purpose—*i.e.*, to prove the identity of the individual (if anyone) who sodomized Marco, and also to prove Enrique's motive in forcing Henry to take the blame for the sexual abuse of Marco. This evidence was relevant and, in fact, probative of the identity of Marco's assailant. The probative value of this evidence is not outweighed by Rule 403 considerations. Although a trial judge must give a limiting instruction if the parties request one, no such instruction ever was requested in this case during the August 2002 trial. Accordingly, it was not error at all, much less prejudicial error, for the court to allow Henry to introduce this type of evidence.

**B.** *Whether the Jury's Verdict was Against the Weight of the Evidence.*

■ Next, the court will consider Marco's separate argument that the jury's verdict was against the weight of the evidence. A motion for a new trial that is grounded on the jury's verdict being against the weight of the evidence generally presents a question of fact, not law, and is committed to the trial court's discretion.[22] "A new trial is not warranted simply because the court would have reached a different verdict."[23] Rather, the court should invoke its discretionary power only in the exceptional case where the verdict is clearly, decidedly, or overwhelmingly against the weight of the evidence.[24] Unfortunately, in the Tenth Circuit and in this district, the degree of discretion that the trial judge possesses in weighing the evidence presented is unclear, and thus some additional discussion is appropriate to clarify the precise procedural standard that applies in the instant case.

1. *The Degree of Discretion Possessed by the Trial Court.*

A number of cases in this district have commented that the court must view the evidence in the light most favorable to the nonmoving party.[25] However, the Tenth

**22.** *Patton v. TIC United Corp.,* 77 F.3d 1235, 1242 (10th Cir.1996); *Brown v. McGraw–Edison Co.,* 736 F.2d 609, 616 (10th Cir.1984).

**23.** *Hillman v. United States Postal Serv.,* 169 F.Supp.2d 1218, 1222 (D.Kan.2001) (quotation omitted); *accord Boyce v. Board of Comm'rs,* 857 F.Supp. 794, 797 (D.Kan.1994).

**24.** *Patton,* 77 F.3d at 1242; *McGraw–Edison,* 736 F.2d at 616; *May v. Interstate Moving & Storage Co.,* 739 F.2d 521, 525 (10th Cir. 1984).

**25.** *See, e.g, Burton v. R.J. Reynolds Tobacco Co.,* 208 F.Supp.2d 1187, 1192 (D.Kan.2002); *Gower v. IKON Office Solutions, Inc.,* 177 F.Supp.2d 1224, 1235 (D.Kan.2001); *Hillman,* 169 F.Supp.2d at 1222; *Rahn v. Junction City Foundry, Inc.,* 161 F.Supp.2d 1219, 1227 (D.Kan.2001); *Seyler v. Burlington N. Santa Fe Corp.,* 121 F.Supp.2d 1352, 1362 (D.Kan.2000); *Affiliated FM Ins. Co. v. Neosho Constr. Co.,* 192 F.R.D. 662, 666 (D.Kan. 2000); *Law v. Nat'l Collegiate Athletic Ass'n,* 185 F.R.D. 324, 326 (D.Kan.1999); *Cadena v. Pacesetter Corp.,* 30 F.Supp.2d 1333, 1336 (D.Kan.1998); *Hampton v. Dillard Dep't Stores, Inc.,* 18 F.Supp.2d 1256, 1261 (D.Kan. 1998); *Deters v. Equifax Credit Info. Servs., Inc.,* 981 F.Supp. 1381, 1385 (D.Kan.1997); *Ramirez v. IBP, Inc.,* 938 F.Supp. 735, 736 (D.Kan.1996); *Townsell v. Lewis,* 938 F.Supp. 728, 729 (D.Kan.1996); *Maberry v. Said,* 927 F.Supp. 1456, 1459–60 (D.Kan.1996); *Eichenwald v. Krigel's, Inc.,* 908 F.Supp. 1531, 1569 (D.Kan.1995); *Hurd v. Pittsburg State Univ.,* 892 F.Supp. 245, 247 (D.Kan.1995); *Wilmer v. Bd. of County Comm'rs,* 153 F.R.D. 165, 168 (D.Kan.1993); *Courtney v. Safelite Glass Corp.,* 811 F.Supp. 1466, 1471 (D.Kan. 1992); *Neyman v. United Telecomms., Inc.,* No. 90–2033, 1992 WL 97808, at *1 (D.Kan. Apr.7, 1992).

Given the court's comments in section III(A) of this opinion, Marco obviously is not entitled to a new trial if the evidence in the trial record must be viewed in the light most favorable to Henry, without any weighing of the evidence.

Circuit cases that purportedly provide authority to support these statements—*Griffin v. Strong,*[26] *Joyce v. Davis,*[27] *Thunder Basin Coal Co. v. Southwestern Public Service Co.,*[28] *Patton v. TIC United Corp.,*[29] and *Macsenti v. Becker*[30]—do not actually support this proposition.

For example, in *Griffin,* the Tenth Circuit actually stated that the court must accept the evidence in the light most favorable to the nonmoving party in the context of motions for directed verdict and judgment notwithstanding the verdict (both of which now simply are called motions for judgment as a matter of law).[31] Similarly, in *Patton,* the court stated that it accepts the evidence in the light most favorable to the nonmoving party in the context of a motion for judgment as a matter of law.[32] In both cases, the court simply went on to state that, with respect to the standard for a motion for a new trial, it reviews the district court's denial of a motion for new trial for an abuse of discretion.[33] In both *Joyce* and *Thunder Basin,* the Tenth Circuit stated that, on appeal, the court must view the evidence in the light most favorable to the prevailing party.[34] However, *Joyce* involved a challenge to the trial court's findings, while *Thunder Basin* involved a challenge to the sufficiency of the evidence. There is no suggestion that either case involved a motion for a new trial. Thus, none of these four cases actually support the proposition that, in ruling on a motion for a new trial, the court must view the evidence in the light most favorable to the prevailing party.

*Macsenti,* on the other hand, arguably provides some support for this proposition. In *Macsenti,* the Tenth Circuit stated: "The contention that the verdict was against the weight of the evidence is patently without merit when the evidence is viewed in the light most favorable to the plaintiff, which of course is the proper standard of review."[35] However, even in *Macsenti,* the Tenth Circuit did not cite any authority to support this statement. With all due respect, it appears that the appeals court panel made this statement without giving much consideration to the appropriate standard of review, undoubtedly because the facts of that case easily supported the jury's verdict and the trial court denied the motion for a new trial which, of course, is the appropriate thing to do in most cases.

The undersigned magistrate judge has not located any precedent that provides well-reasoned support for the proposition that the court must view the evidence in the light most favorable to the prevailing party when ruling on a motion for a new trial. It appears that this proposition has been perpetuated by the fact that courts commonly consider motions for new trials along with motions for judgment as a matter of law, but fail to distinguish the unique standards applicable to each.[36]

---

26. 983 F.2d 1544, 1546 (10th Cir.1993).

27. 539 F.2d 1262, 1264 (10th Cir.1976).

28. 104 F.3d 1205, 1212 (10th Cir.1997).

29. 77 F.3d 1235, 1242 (10th Cir.1996).

30. 237 F.3d 1223, 1235 (10th Cir.), *cert. denied,* 533 U.S. 950, 121 S.Ct. 2593, 150 L.Ed.2d 752 (2001).

31. 983 F.2d at 1546.

32. 77 F.3d at 1240.

33. *Patton,* 77 F.3d at 1240; *Griffin,* 983 F.2d at 1546.

34. *Thunder Basin,* 104 F.3d at 1212; *Joyce,* 539 F.2d at 1264.

35. 237 F.3d at 1235.

36. This confusion is somewhat common. *See generally* 12 Moore's Federal Practice § 59.13[2][f][iii][B], at 59–73 (Matthew Bender 3d ed.) (discussing this confusion); 11 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice & Procedure § 2806, at 63 78 (2d ed.1995) (same).

By comparison, a number of other cases in this district have held that the court may weigh the evidence for itself and assess the credibility of the witnesses when ruling on a motion for a new trial.[37] This standard is consistent with the overwhelming weight of modern authority.[38] This standard also provides a meaningful distinction between motions for judgment as a matter of law (*i.e.,* notwithstanding a verdict) and motions for a new trial, *i.e.,* the former directs judgment in favor of a party whereas the latter affords a lesser remedy.

 In sum, in light of the lack of clear, well-reasoned authority on this issue in the Tenth Circuit and in this district compared to the overwhelming weight of modern authority in other circuits, as well as the fact that it should be more difficult to obtain an order granting a motion for judgment as a matter of law than it is to obtain an order granting a motion for a new trial, the court is persuaded that, in ruling on a motion for a new trial, it may reweigh the evidence and assess the credibility of witnesses. Of course, in doing so, the court still must be mindful that it may not usurp the jury's function simply be-

**37.** *See, e.g., Sauceda v. Dailey,* Case No. 97–2278, 1998 WL 709602, at *2 (D.Kan. Sept.11, 1998); *Laughinghouse v. Risser,* 786 F.Supp. 920, 922 (D.Kan.1992); *Burbank v. Morris,* Case No. 90–2070, 1992 WL 279759, at *1 (D.Kan. Jan.8, 1992); *Pac. Employers Ins. Co. v. P.B. Hoidale Co., Inc.,* 804 F.Supp. 137, 141 (D.Kan.1992); *Bosley v. Foster,* Case No. 90–2409, 1992 WL 123823, at *1 (D.Kan. May 27, 1992); *Saviour v. Kan. City,* Case No. 90–2430, 1992 WL 223804, at *4 (D.Kan. Aug.19, 1992); *McLoughlin v. Golf Course Superintendents Ass'n of Am.,* Case No. 85–4499, 1991 WL 230702, at *1 (D.Kan. Oct.30, 1991); *Commons v. Montgomery Ward & Co.,* 614 F.Supp. 443, 449 (D.Kan.1985), *judgment set aside on other grounds,* 695 F.Supp. 504 (D.Kan.1988). The court is aware of the Tenth Circuit's holding in *Wilson v. Burlington N. R.R. Co.,* 804 F.2d 607, 610 (10th Cir.1986), but believes that the reasoning of that case is confined to cases brought under the Federal Employers' Liability Act, 45 U.S.C. §§ 51–60.

**38.** *See, e.g., Manus v. Am. Airlines, Inc.,* 314 F.3d 968, 973 (8th Cir.2003) (trial court is entitled to interpret the evidence and judge the credibility of witnesses on a motion for a new trial); *Farrior v. Waterford Bd. of Educ.,* 277 F.3d 633, 634–35 (2d Cir.) (district court is free to weigh the evidence on a motion for new trial and need not view the evidence in the light most favorable to the verdict winner), *cert. denied,* 536 U.S. 958, 122 S.Ct. 2661, 153 L.Ed.2d 836 (2002); *Mentor H/S, Inc. v. Med. Device Alliance, Inc.,* 244 F.3d 1365, 1374 (Fed.Cir.2001) (district court may weigh the evidence and credibility of the witnesses on a motion for a new trial); *Conner v.*

*Schrader–Bridgeport Int'l, Inc.,* 227 F.3d 179, 200 (4th Cir.2000) (district court may weigh the evidence and consider the credibility of the witnesses on a motion for a new trial); *Clay v. Ford Motor Co.,* 215 F.3d 663, 672 (6th Cir.2000) (district court must compare and weigh evidence on a motion for a new trial); *Whitehead v. Food Max of Miss., Inc.,* 163 F.3d 265, 270 (5th Cir.1998) (district court may weigh the evidence in ruling on a motion for a new trial, and it need not view the evidence in the light most favorable to the verdict winner, as is required in passing on motions for judgment as a matter of law); *Thomas v. Stalter,* 20 F.3d 298, 304 (7th Cir. 1994) (district court may weigh the evidence and assess the witnesses' credibility in ruling on a motion for a new trial); *Landes Constr. Co. v. Royal Bank of Canada,* 833 F.2d 1365, 1371 (9th Cir.1987) (trial court may weigh the evidence and assess the credibility of witnesses on a motion for a new trial, and it need not view the evidence in the light most favorable to the prevailing party); *Mayo v. Schooner Capital Corp.,* 825 F.2d 566, 569 (1st Cir.1987) (district court may consider witnesses' credibility in ruling on a motion for a new trial); *see also* 12 Moore's Federal Practice, *supra* note 36, § 59.13[2][f][iii][B], at 59–73 ("On a motion for new trial ... the judge may make his or her own judgments as to credibility."); 11 Wright et al., *supra* note 36, § 2806, at 67 (2d ed. 1995) ("[O]n a motion for a new trial on the ground that the verdict is against the weight of the evidence, the judge is free to weigh the evidence for himself").

cause the court would have reached a different result than the jury. Rather, as the Tenth Circuit has instructed, the court must invoke its discretionary power only in an exceptional case where the verdict was clearly, decidedly, or overwhelmingly against the weight of the evidence.

2. *Whether This is an Exceptional Case Where the Jury's Verdict was Clearly, Decidedly, or Overwhelmingly Against the Weight of the Evidence.*

■ In this case, after a great deal of deliberation, the court concludes that this is truly an exceptional case where the jury's verdict was clearly, decidedly, and overwhelming against the weight of the evidence. As earlier indicated, the court acknowledges that Henry presented some evidence at trial to support his theory that Marco was abused, if at all, by Enrique, and that Marco brought the instant lawsuit to attempt to recover from Henry's portion of Enrique's estate. However, having carefully considered the trial record as a whole, the court is firmly convinced that the quality of Henry's evidence in this regard was, collectively, very poor. Overall, it was unpersuasive for a variety of reasons, as explained below.

Marco was an exceptionally credible witness. It seems inconceivable that the jury totally disregarded his testimony. On cross-examination, Marco candidly admitted that his recollection regarding some minor details surrounding the incidents of sodomy was somewhat imprecise (*e.g.,* whether, just prior to one episode of alleged abuse, Henry was in the bathroom

and asked Marco to hand him some toilet paper, or soap). It is imminently understandable that Marco's memory was imperfect because the incidents occurred fourteen years prior when he was only seven years old. More importantly, though, Marco testified in vivid, passionate detail regarding the actual incidents of sodomy—for example, Henry telling him to "shut the fuck up"; Henry slamming him onto the bed and sodomizing him while his face was buried in the bed; Henry telling him to pick up a shoe, and then shoving him under the bed and sodomizing him while he "was on all fours and all stuck under the bed"; and the fact that these incidents happened so fast when he was not expecting them and that, as a young child, he did not know what to do. The court was definitely persuaded that, based on the substance of Marco's testimony and his demeanor while he was explaining these incidents, he was telling the truth.

By comparison, the most charitable characterization that the court can muster with respect to Henry is that he was an extremely poor witness at trial. He seemed all too rehearsed, willing to say anything, disingenuous, and thus unpersuasive and unconvincing. Simply put, Henry was not credible.

Given the mutually exclusive factual positions staked out by Marco and Henry, it is quite significant that there was only one disinterested witness who opined on who committed the sexual abuse—Paula Kahmann, the mental health counselor who treated *both* Marco and Henry.[39] Kahmann's testimony was very persuasive. She spent numerous hours with Marco (and probably Henry, too[40]) during the

---

39. None of Henry and Marco's many siblings corroborated or disputed their testimony with respect to who sexually abused Marco in 1988.

40. The court was never called upon to decide directly whether any testimony from Kahmann regarding her individual counseling

sessions with Henry would have been privileged and thus inadmissible. During the first trial, Marco's counsel seemed to concede that a privilege was applicable. However, based on a brief review of the pertinent statutes, K.S.A. 38–1522, 65–5603(4), 65–6315(a)(2) & (c), and 74–5323(b), the court is unpersuaded

two-year period immediately following the sexual abuse.

With this being said, the court feels compelled to reconcile its reasoning in this section with its holding in section III(A) above that the evidence regarding Enrique's sexual abuse of Miriam and Siboney was probative of the identity of Marco's assailant. The court continues to believe that this evidence remains sufficiently probative and that Henry ought to be allowed to present this evidence in order to attempt to refute the allegations made against him. However, given the totality of the trial record (at least that presented in August 2002), the court believes that a reasonable trier of fact simply could not have found that evidence sufficiently persuasive to outweigh the far more persuasive testimony of Marco and Kahmann. Indeed, Kahmann reconciled the two lines of evidence. She specifically testified that she was "concerned [Marco] may have been misused by his father, but [she] never doubted he was misused by his brother." This comment provides even further support for the court's evaluation of Kahmann's credibility, as it evidences that she was savvy and recognized that Enrique was likely another source of abuse in the home. Yet, most notably, after two years of counseling both Marco and Henry, she never doubted that Henry sexually abused Marco.

As earlier indicated, the court believes that this is truly an exceptional case where the jury's verdict was clearly, decidedly, and overwhelmingly against the weight of the evidence. Therefore, the court will grant Marco's motion for a new trial on this basis.

The court does not relish—indeed, the court dreads-the prospect of retrying this grisly, tragic case. The easy thing to do here would be to simply avoid a new trial by saying that the first jury believed Henry and disbelieved Marco. The court will not take the easy way out and instead will decide this case in a manner that it believes to be legally correct.

Presumably, the prospect of a second trial is something that the Rivera siblings dread too, as they now will have to re-live sexual horrors of their childhoods one more time in a public courtroom. If Marco and Henry have any sense of compassion left in them (which may be doubtful given the sheer hell that served as childhood in the twisted Rivera household), then they very well may wish to consider sparing themselves and their siblings further emotional trauma stemming from this litigation and attempt to reach some reasonable, out-of-court settlement. The court encourages Marco and Henry to strive toward some sort of compromise, by meeting man to man, negotiating through counsel, engaging the services of a qualified mediator, or some combination of the foregoing.

## IV. Order.

In consideration of the foregoing,

IT IS HEREBY ORDERED:

1. Plaintiff's motion for a new trial (**doc. 48**) is granted.

2. The court will convene a status conference by telephone on **May 28, 2003, at 9:00 a.m.,** to set a new trial date. Counsel should make themselves available at the telephone numbers listed in the pleadings. The court will initiate the conference call. The court is inclined to leave in place the various deadlines set forth in the pretrial order (doc. 22) with respect to submission

---

that any privilege actually would apply with respect to testimony by Kahmann that she believed, based on her counseling sessions with Henry, that Henry abused Marco. Accordingly, in connection with the re-trial of this case, the court invites further briefing by both parties on this issue.

of any additional motions in limine, final exhibit and witness disclosures, proposed jury instructions, trial briefs, etc. Further, the court is inclined to instruct the jury upon re-trial in generally the same manner as the first jury was instructed. Accordingly, subject to input by the parties' attorneys, the court anticipates that the only jury instructions the parties need to file at this point would be those necessary to protect the record for appeal, *i.e.*, earlier instructions that were proposed but that the court declined to give can simply be incorporated by reference. The court invites counsel to consider the above-described procedural issues as well as any others they believe would bear on efficiently trying this case a second time.

3. The clerk shall serve copies of this memorandum and order on all counsel of record.